# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

       v.                                    No. CIV 15-680

HIGH PLAINS LIVESTOCK, LLC, dba
PRODUCERS LIVESTOCK AUCTION,
MICHAEL FLEN, CALVIN PAREO,
and DARCIE PAREO,

       Defendants.

## COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES

The United States of America, by its undersigned attorneys and on behalf of the Secretary of the United States Department of Agriculture, brings this civil action under the Packers and Stockyards Act, as amended and supplemented, 7 U.S.C. § 181 *et seq.* (the "PSA") for injunctive relief and civil penalties. The United States alleges as follows:

## JURISDICTION

1. This action arises under the PSA which authorizes the Attorney General of the United States, pursuant to 7 U.S.C. §§ 224 and 228a, to initiate appropriate proceedings to be commenced and prosecuted in the proper courts of the United States.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

3. Venue is proper in the District of New Mexico as, upon information and belief Defendant High Plains Livestock, LLC, is incorporated in New Mexico with its principal place of business in Portales, New Mexico, and all the acts complained of herein occurred in Portales, New Mexico.

4.     This action is brought pursuant to section 408 of the PSA, 7 U.S.C. § 228a, to enjoin Defendants from operating subject to the Act while sellers and consignors remain unpaid and while buyers remain unpaid for amounts overcharged; and pursuant to 7 U.S.C. § 213 and 224; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv) for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation of the PSA.

## PARTIES

5.     Upon information and belief High Plains Livestock, LLC, doing business as Producers Livestock Auction ("HPL"), is a limited liability company organized and existing under the laws of the State of New Mexico with its principal place of business near Portales, New Mexico.

6.     Michael Flen ("Defendant Flen") is an individual with a business mailing address at Portales, New Mexico.  Defendant Flen is the recorded owner of HPL.

7.     The actions and omissions of the other Defendants, as set forth here, are deemed the actions and omissions of Defendant Flen.  7 U.S.C. § 223.

8.     Defendant Calvin Pareo is an individual with a business mailing address at Portales, New Mexico.  Defendant Calvin Pareo is a partner in fact with Michael Flen and manages the livestock operations of HPL.  Defendant Calvin Pareo made all purchases of the livestock and managed all livestock activities as set forth more fully below.

9.     Defendant Darcie Pareo is an individual with a business mailing address at Portales, New Mexico.  Defendant Darcie Pareo is the corporate secretary for HPL, manages the administrative and financial operations of HPL, and directly participated in the complained of actions described more fully below.

10.     Upon information and belief, at all relevant times, Defendants Flen, Calvin Pareo, and Darcie Pareo worked and lived in the State of New Mexico.

# BACKGROUND

11.     The PSA regulates, among other things, the sale of livestock in commerce for purposes of slaughter to insure that farmers and ranchers receive true market value of their livestock and to protect consumers from unfair practices in marketing of meat products.  7 U.S.C. §§ 196, 201.

12.     Specifically, the PSA regulates stockyards, which is defined in relevant part as a facility that operates as a public market for livestock producers and buyers, which consists of pens or other enclosures, and in which livestock are received, held, or kept for sale or shipment in commerce.  7 U.S.C. § 202.

13.     A market agency is any person engaged in the business of buying or selling livestock on a commission basis or furnishing stockyard services.  7 U.S.C. § 201(c).

14.     A dealer is any person engaged in the business of buying and selling livestock in commerce for the dealer's own account or as the employee or agent of the vendor or purchaser. 7 U.S.C. § 201(d).

15.     Every person operating as a market agency or dealer must be registered with the Secretary of Agriculture ("Secretary").  7 U.S.C. § 203; 9 CFR § 201.10.

16.     Defendant HPL is registered with the Secretary as a dealer and as a market agency.

17.     Defendant Flen is the sole registered owner of HPL.

18.     Defendant Calvin Pareo is, and at all relevant times, was not registered as a market agency or dealer or as a registered owner of an entity that is registered as a market agency or dealer.

19.     While Defendant Calvin Pareo bought and sold cattle at and on behalf of HPL, he did not receive a salary.

20.     Defendant HPL operated a stockyard that primarily auctioned cows from the dairy industry for a commission.  The auctioned cows were owned by sellers or "consignors" and were sold to buyers who in turn often sold the cows for slaughter.

21.     At all relevant times the auction took place every Monday and Thursday.

22.     For each individual or entity that bid on the cattle ("buyer"), HPL assigned a number to that buyer.  Attached as Exhibit 1 is a list of relevant buyers.

23.     An auction was conducted as follows: a cow was taken into a ring, which was also a scale, the scale was balanced, the cow was weighed, and a "scale ticket" indicating the cow's weight was printed.  Bids were solicited for the cow.  For each sale, the clerk weighing the cow wrote on the scale ticket: the number identifying the cow ("back tag number"), any abnormal physical condition of the cow, the amount of the winning bid, and the number assigned to buyer with the high bid.

24.     After the weighing clerk completed the scale tickets, the tickets were taken to the office and HPL employees entered the information from the ticket into HPL's sale software.

25.     The sale of livestock is required to be documented on a scale ticket, which is serially numbered and used in sequence.  9 C.F.R. § 201.49(a).

26.     As required by 9 C.F.R. § 201.49(b), scale tickets for the sale of livestock must record:

   a.   The name and location of the agency performing the weighing service;

   b.   The date of the weighing;

   c.   The name of the buyer and seller or consignor;

   d.   The number of head sold;

   e.   The kind of livestock;

   f.   The actual weight of the livestock;

4

g.  Identification of the person weighing the livestock.

27.    HPL represented to the public and to the Secretary that it received twenty-one dollars ($21.00) per head for commission for the sale of each cow, regardless of the amount paid for the cow, or the identity of the purchaser.

28.    Pursuant to 7 U.S.C. § 221 and 9 C.F.R. § 201.42, HPL, and all authorized livestock markets, are required to maintain a custodial account for trust funds.  Payments made by a livestock buyer to a market agency selling on commission are trust funds.  9 C.F.R. § 201.42(a)

29.    All proceeds received by the livestock market from the sale of livestock must be deposited into a custodial account before the close of business on the day following the sale.  9 C.F.R. § 201.42(c)

30.    Regardless of whether the livestock market has collected all proceeds from the sale, it has seven days to deposit an amount equal to all the remaining proceeds receivable into the custodial account.  9 C.F.R. § 201.42(c)

31.    Before the close of business on the day following the sale, the market agency must transmit or deliver the net proceeds received from the sale to the consignor.  9 C.F.R. § 201.43(a)

32.    On or about November 10, 2014, Defendant Darcie Pareo signed a Civil Penalty Stipulation Agreement dated October 23, 2014, on behalf of Defendant HPL to resolve allegations regarding three shortages found in HPL's custodial account on March 29, 2013, April 30, 2013, and November 29, 2013.

33.    Pursuant to the Stipulation Agreement, HPL remitted payment of a penalty totaling six thousand six hundred dollars ($6,600.00) (or $2,200 per violation) to the US Treasury.

34.     On or about December 2, 2014, an agent of the Department of Agriculture, Grain Inspection, Packers and Stockyards Administration ("GIPSA") conducted a follow up review of the HPL custodial account.  During the course of this review, the agent discovered scale tickets that appeared to have been altered.

35.     On or about January 21, 2015, a task force of law enforcement personnel comprised of individuals from the New Mexico Livestock Board ("NMLB"), GIPSA and the Roosevelt County District Attorney's Office executed a search warrant on the premises of HPL.

36.     During the execution of the search warrant, it was discovered that HPL's license to operate with the NMLB had expired effective December 31, 2014.

37.     On February 9, 2015, Darcie Pareo and Michael Flen were arrested in Roosevelt County, New Mexico for multiple violations of the livestock auction market regulations.

38.     Upon information and belief, HPL attempted to renew its license, but the NMLB elected not to reissue the license while criminal charges are pending against Defendants Darcie Pareo and Flen.  HPL, therefore, effectively ceased operations as a livestock auction on or about January 21, 2015.

39.     Upon information and belief, Defendants continue to operate as dealers of livestock.

## DEFENDANTS' UNLAWFUL CONDUCT

40.     Defendant HPL, acting through Defendants Flen, Calvin Pareo, and Darcie Pareo, have repeatedly violated the PSA and regulations passed pursuant to the PSA, by failing to properly maintain their custodial accounts, misusing their custodial accounts, failing to maintain accurate and true records, generating false documents, failing to remit the full amount due for livestock; altering sale documents, including scale tickets and seller invoices, for the purpose of

avoiding payment of the full amount due for livestock purchased for and on behalf of Defendants; and misrepresenting the true purchasers of livestock. (Exhibits 2-9).

41.     Defendants developed a scheme to and did defraud both buyers and consignors of cattle auctioned at HPL for the benefit of Defendants.

42.     Pursuant to this scheme, Defendant Calvin Pareo, using HPL's market support bid number 17, bid on consignor cows, and his wife and HPL manager, Defendant Darcie Pareo, fraudulently altered scale tickets and sales and buyer invoices as set forth more fully herein.

43.     Proceeds from the fraud went into HPL's accounts, which were used by the Pareo Defendants for their personal use by, for example, paying the Pareo Defendants' personal bills and other expenses.

44.     During and after an auction, Defendant HPL's data entry clerks entered the data from the auction scale tickets into HPL's electronic sale software, including the back tag number, the cow's weight, the buyer that had the winning bid, and the final sales price.

45.     The sale software requires the clerks to enter the back tag number, weight, and price a second time to ensure accuracy.

46.     Upon information and belief, shortly thereafter, Defendant Darcie Pareo accessed the sale software and, for purchases made by Defendant Calvin Pareo using Defendant HPL's market support bid number, altered the final sales price to a lesser amount.

47.     Defendant Darcie Pareo also altered the price on the scale ticket to be consistent with her alteration in the HPL sale software.

48.     Scale tickets were also altered to reflect lower prices for other buyers, but when done so, at some point in the process, Defendant HPL's market support bid number was associated with the cow. The lower price inured to the benefit of Defendants.

49. These other buyers included Seminole Growers, Massa #2 and Massa #3. Neither Seminole Growers nor Massa purchased these cows, or authorized Defendant Calvin Pareo to make these purchases on their behalf, or even had knowledge of the purchases.

50. After an auction, Defendant HPL generated a seller's invoice for the consignor. The seller's invoices generated for cattle purchased in the auction by Defendant Calvin Pareo did not accurately reflect that he purchased the cow. Rather, the seller's invoice indicated that the cow was purchased by a third party.

51. The Massa purchases were purportedly made on behalf of Mick Massa, a registered dealer from Mulberry, Kansas.

52. Defendants also purchased cattle under the name of Defendant Darcie Pareo's father, Richard Pope. Upon information and belief, Mr. Pope was a fictitious purchaser and some or all of the cattle were actually purchased for Defendants' account.

53. Defendants then sold the cows to packing houses for Defendants' profit.

54. Market agencies engaged in the business of selling livestock on a commission are required to sell the livestock consigned to it openly, and in such a manner as to best promote the interest of each seller or consignor. 9 C.F.R. § 201.56(a).

55. A market agency selling livestock on a commission basis cannot allow its owners, officers, or employees to purchase livestock consigned to the market without first offering the livestock for sale in an open and competitive manner to other available buyers. In that event, the owners, officers, and employees may only purchase the livestock at a price higher than the highest available bid. 9 C.F.R § 201.56(b).

56. If an owner, officer or employee of the market agency purchases livestock, the market agency must disclose the name of the buyer and the nature of the relationship between the buyer and the market. 9 C.F.R § 201.56(d).

### January 19, 2015 Sale

57.     Defendants inaccurately and fraudulently entered the purported bid amount on seller invoices and/or scale tickets in their favor for one hundred sixty-eight (168) transactions made during the sale on January 19, 2015.  Exhibit 2 is a list of altered sales prices from the January 19, 2015 auction.  All changes moved the price lower in favor of one or all of the Defendants.

58.     Forty-seven scale tickets (47) were altered to reflect a lower bid amount.  One hundred and twenty-one (121) of the tickets were not altered, but Defendant HPL's records and the seller's invoice showed a lower bid than reflected on the scale ticket.  A total of thirty-six (36) sellers were impacted by Defendants' fraudulent pricing.  Exhibit 2.

59.     Upon information and belief, Defendant Darcie Pareo had not completed all of the alterations of the scale tickets before the search warrant was executed.

60.     Some of the sellers' invoices had notations which would appear to justify the lower bids, such as "sad," "sick," "crippled," etc.  The same information is not noted on the related scale tickets, which is where the cow's condition would have been originally noted.

61.     By way of example, the first line on Exhibit 2 shows that buyer "17-22" bid 92.00 cents per hundred weight for a cow with a tag number of 4175 from TJ Dairy, for a total value of one thousand, one-hundred twenty-seven dollars ($1,127.00).  A review of the scale ticket for cow 4175, attached as Exhibit 3, shows that the scale ticket was altered from 92.00 to 82.00.  There is no indication that the cow showed infirmities.  The seller's invoice, which is attached as Exhibit 4, shows that cow 4175 was "sad" and sold for 82.00 cents per hundred weight for a total price of one thousand, four and 50/100 dollars ($1,004.50) to buyer "18-1", rather than buyer 17-22 as indicated on the scale ticket, allowing Defendants to retain a total of one hundred twenty-two and 50/100 dollars ($122.50) for the single cow.

62.     Purchase sheets generated by Defendant HPL's computer system identified buyer "18-1" as Seminole Growers. Exhibit 1. Upon information and belief, Seminole Growers is owned by Duane Zortman. In January 2015, Mr. Zortman informed GIPSA that Seminole Growers had not purchased any cattle through Defendant HPL for Seminole Growers for at least the previous six months.

63.     The second line on Exhibit 2 shows that buyer "17-44" bid 100.00 cents per hundred weight for a cow with a tag number 4250 from 3 H Progress, which would have resulted in a total value of one thousand, six hundred fifty-five dollars ($1,655.00). The scale ticket, attached as Exhibit 5, shows that the bid was 100.00 cents per hundred weight. The seller's invoice, which is attached as Exhibit 6, shows that cow 4250 and sold for 90.00 cents per hundred weight for a total price of one thousand, four hundred eighty-nine, and 50/100 dollars ($1,489.50) to buyer "16-1" (not to buyer 17-44 indicated on the scale ticket) allowing Defendants to retain a total of one hundred sixty-five, and 50/100 dollars ($165.50) for the single cow.

64.     Defendants also failed to remit payments from the January 19, 2015, sale to some or all of the sellers within the time prescribed by statute.

65.     The total underpayment to all affected sellers for the January 19, 2015, sale was twenty-nine thousand, three hundred forty-four, and 95/100 dollars ($29,344.95).

**January 15, 2015 Sale**

66.     With respect to the auction on January 15, 2015, Defendants made after-auction alterations to the bid amounts in their favor for one hundred seventy six (176) transactions. Exhibit 7 is a list of after-auction altered sales prices from the January 15, 2015 auction. Defendants altered both the scale tickets and the seller's invoice to reflect a lower price than that

actually bid by Defendant Calvin Pareo.  A total of thirty-nine (39) sellers were impacted by Defendants' fraudulent pricing.  Exhibit 7.

67.     Defendants also failed to remit payments from the January 15, 2015, sale to some or all of sellers within the time prescribed by statute.

68.     The total underpayment to all affected sellers for the January 15, 2015, sale was twenty-nine thousand, seventy-eight, and 72/100 dollars ($29,078.72).

**November 17, 2014 Sale**

69.     Defendants lowered the sale price in their favor for one hundred fifty-one (151) transactions during the November 17, 2014, auction, affecting thirty-ninet (39) sellers.  Exhibit 8 is a list of after-auction altered sales prices from the November 17, 2014, auction.  Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.

70.     The total underpayment to all affected sellers for the November 17, 2014, sale was twenty-eight thousand, seven hundred seven, and 95/100 dollars ($28,707.95).

**November 3, 2014 Sale**

71.     Defendants lowered the sale price in their favor for one hundred sixty seven (174) transactions during the November 3, 2014, auction, affecting thirty-four (35) sellers.  Exhibit 9 is a list of after-auction altered sales prices from the November 3, 2014, auction.  Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.

72.     The total underpayment to all affected sellers for the November 3, 2014, sale was thirty-one thousand, five hundred thirty-three, and 93/100 dollars ($31,533.93).

**March 31, 2014 Sale**

73.     Defendants lowered the sale price from the March 31, 2014, auction in their favor for ninety (90) transactions.  Exhibit 10 is a list of after-auction altered sales prices from the

March 31, 2014, auction. Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.

74. The total underpayment to all affected sellers for the March 31, 2014, sale was twenty thousand, two hundred twenty-nine, and 88/100 dollars ($20,229.88).

### March 27, 2014 Sale

75. After the March 27, 2014, auction, Defendants lowered the sale price in their favor for one hundred twenty-eight (128) transactions. Exhibit 11 is a list of after-auction altered sales prices from the March 27, 2014, auction. Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.

76. The total underpayment to all affected sellers for the March 27, 2014, sale was thirty-one thousand, five, and 66/100 dollars ($31,005.66).

### March 13, 2014

77. Defendants lowered the sale price from the March 13, 2014, auction in their favor for one hundred five (105) transactions. Exhibit 12 is a list of after-auction altered sales prices from the March 13, 2014, auction. Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.

78. The total underpayment to all affected sellers for the March 13, 2014, sale was twenty-four thousand, six hundred fifty-four, and 40/100 dollars ($24,654.40).

### Additional Scale Ticket Alterations

79. Upon information and belief, Defendants have been lowering the sale price in their favor for years.

80. A review of random tickets from auctions on March 10, 2014; March 17, 2014; March 27, 2014; April 3, 2014; April 24, 2014; October 30, 2014; November 3, 2014; November 13, 2014 and November 17, 2014, shows Defendants lowered the sale price in their favor for at

least seventy-eight (78) transactions.  Exhibit 13.  Defendants altered both the scale tickets and the seller's invoice to reflect the lower price.  The total number of altered transactions from just these sales is in the hundreds.

81.	The total underpayment to all affected sellers for these sales for the randomly selected tickets was eighteen thousand, five hundred seven, and 65/100 dollars ($18,507.65).

82.	Defendants' total underpayment due to altered bids for these auctions total approximately two hundred forty thousand dollars ($240,000).

83.	Defendants held approximately two auctions per week, fifty weeks per year, for the past five years and, upon information and belief, Defendants altered the sales price in their favor for hundreds, if not thousands, of additional transactions, and failed to make payment to the sellers within the time prescribed by statute.

84.	All of the above referenced price changes were in favor of Defendants and were for livestock that were being purchased for Defendants' account, though the records reflect the use of fictitious purchasers to conduct the transactions.

85.	Defendants' actions deprived the consignor of the right to receive the high bid for the livestock and deprived legitimate purchasers of the right to participate fully and fairly in the auction.

86.	The purchase of cattle through fictitious buyers allowed Defendants to circumvent PSA reimbursement regulations and avoid suspicion of Defendants' unlawful actions.

**Defendants Purchase of Live Cows Documented as Dead**

87.	On November 6, 2014, Defendants purchased a cow with a tag number 6111, which was marked as "dead" on the seller's invoice and for which Defendants paid one dollar ($1.00).  Exhibit 14.

88.     Defendants charged a sales commission of twenty-one dollars ($21.00) for the sale of the "dead" cow, resulting in Defendants receipt of twenty dollars ($20.00) for the "dead" cow.  Exhibit 14.

89.     Defendants then billed themselves one dollar ($1.00) for the dead cow.  Exhibit 15.

90.     Defendants then sold and shipped the reincarnated cow with tag number 6111 to H&B Packing Co., Inc. for one thousand, four hundred eighty-seven, and 35/100 dollars ($1,487.35).  Exhibit 16.

91.     By selling the cow to the packing plant and not auctioning the cow through the ring, Defendants improperly retained profits totaling one thousand, five hundred seven, and 35/100 dollars ($1,507.35) comprised of the price paid by the packing plant plus the commission less the purchase price of one dollar ($1.00).

92.     Defendant Darcie Pareo instructed an HPL employee to remove cattle purchased by Defendant Calvin Pareo using Defendant HPL's market support number from seller's invoices on more than one occasion.  The employee was told to mark certain cattle as dead. When the employee asked Defendant Darcie Pareo about this, she was instructed not to ask questions and do what she was told.

**Defendants Price Increases for Certain Purchasers**

93.     When interviewed by law enforcement personnel on January 21, 2015, Defendant Calvin Pareo indicated he was aware of complaints by Caviness Packing that Caviness Packing was billed more for cattle than it had offered at HPL auction.

94.     Documents obtained during the search warrant indicated that on March 27, 2014, Caviness Packing purchased numerous cows at HPL auctions.  For eleven (11) of those cows,

Defendants altered the corresponding scale tickets to reflect a higher price than the amount documented in the auction ring. Defendants then billed Caviness the higher price.

## Misuse and Shortages of Funds Deposited in the Custodial Account

95.     PSA regulations require that Defendants maintain the proceeds from the auctions for the benefit of the sellers in a trust account. 9 C.F.R. § 201.42. No funds may be withdrawn from the account except to pay the consignor or shipper; to pay lawful charges against the consignment; and to obtain sums due the market agency as compensation for services. *Id.*

96.     Defendants used the funds from the custodial account to reimburse employee Rosario Villagran for parts, fuel, tire repair, and other expenses by checks drawn on the custodial account dated July 13, 2014, December 11, 2014, January 3, 2015, and January 18, 2015.

97.     Multiple checks from the custodial account made out to Mr. Pope were discovered in the drawers of Defendant Darcie Pareo's desk at HPL.

98.     When asked about these checks, Defendant Flen stated that all checks made out to Mr. Pope could be voided to balance the custodial account.

99.     Other checks from the custodial account were written to the Pareo's minor child, Cutter Pareo.

100.     Audits disclosed that on October 31, 2014, HPL had a custodial account shortage in the amount of seven-hundred twenty-four thousand, five, and 82/100 dollars ($724,005.82).

101.     Audits disclosed that on February 4, 2015, HPL had a custodial account shortage in the amount of six hundred eighty-three thousand, nine hundred twenty-seven, and 43/100 dollars ($683,927.43).

102.     Audits disclosed that on February 27, 2015, HPL had a custodial account shortage in the amount of six hundred sixty-two thousand, one hundred sixty-three, and 26/100 dollars ($662,163.26).

103.    Upon information and belief, Defendants have misused the custodial account for other improper purposes.

## COUNT I

### (Failure To Remit Full Purchase Price)

104.    Paragraphs 1-103 are incorporated herein by reference as if fully set out.

105.    9 C.F.R. § 201.43, details how and when a market agency is to remit the net proceeds due to consignors after their livestock is sold.

106.    HPL is required to deliver to the seller the full purchase price of the livestock before the close of business the day following the sale.  9 C.F.R. § 201.43(a).

107.    Each failure to pay the full purchase price in a timely manner is an unfair practice under the PSA.  7 U.S.C. § 228b.

108.    It is unlawful for any stockyard owner or market agency to engage in any unfair practice.  7 U.S.C. § 213(a).

109.    As set forth more fully above, Defendants failed to pay the sellers the full amount due (i.e., the high bid amount determined at auction) and failed to provide a true account of the price and the buyer as required by the PSA and regulations on tens of thousands of occasions in violation of 7 U.S.C. §§ 208, 213, 221.

110.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.  7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT II

### (Failure to Disclose True Ownership of HPL)

111.    Paragraphs 1-110 are incorporated herein by reference as if fully set out.

112.    Defendant Flen is the only registered owner of HPL.

113.    Defendants have represented that Defendant Calvin Pareo and Defendant Flen are partners and co-owners of HPL.

114.    Defendant Calvin Pareo conducts himself as a partner and co-owner of HPL by, among other things, using HPL funds for personal transactions.

115.    Defendants have thereby failed to fully and correctly disclose all transactions involved in his business, including true ownership of such business.  7 U.S.C. § 208, 213, 221.

116.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) for each violation.   7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT III

### (Charging Undisclosed And Unapproved Rates and Commissions)

117.    Paragraphs 1-116 are incorporated herein by reference as if fully set out.

118.    The rates and commissions charged by HPL are regulated by the PSA and "shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate or charge is prohibited and declared to be unlawful."  7 U.S.C. § 205.

119.    HPL is required to provide its rates to the Secretary and to publish and keep open to the public all rates and charges for stockyard services.  7 U.S.C. § 206.

120.    HPL is prohibited from changing its rates and charges without first providing the Secretary and the public ten days' notice.  *Id.*

121.    Each instance where Defendants lowered the purchase price in their favor for cattle purchased by Defendants essentially resulted in a higher commission for the sale of the cattle.

122.    These additional commissions were undisclosed and were unjust and unreasonable, each in violation of PSA and its regulations.

123.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.    7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT IV

### (Fraudulently Altered Scale Tickets Post-Auction)

124.    Paragraphs 1-123 are incorporated herein by reference as if fully set out.

125.    HPL is required to keep accounts and records so as to fully and correctly disclose all transactions involved in the business.  7 U.S.C. § 221; 9 C.F.R. § 201.56 (d).

126.    As set forth more fully above, Defendants altered the high bid on the scale tickets on tens of thousands of occasions in violation of the PSA and its regulations.

127.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.    7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT V

### (Failing To Identify True Purchaser)

128.    Paragraphs 1-127 are incorporated herein by reference as if fully set out.

129.    Each failure of Defendants to disclose when any of one or more of Defendants purchased consigned livestock is an unfair practice and a violation of the PSA.  7 U.S.C. § 213.

130.    As set forth herein, Defendants failed to identify when one or more of Defendants purchased consigned livestock on thousands of occasions.

131.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.    7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT VI

### (Custodial Account Shortages)

132.    Paragraphs 1-131 are incorporated herein by reference as if fully set out.

133.    Defendants are required to establish and maintain a separate bank account to hold payments for livestock held in trust for the seller.  9 C.F.R. § 201.42(b).

134.    Defendants are required to deposit all proceeds from the sale of livestock into the custodial account.  9 C.F.R. § 201.42(c).

135.    Failure to properly maintain the custodial account is an unfair practice.

136.    As set forth above, Defendants' records have repeatedly shown a deficit in an amount exceeding six hundred thousand dollars ($600,000) in the custodial account, demonstrating a violation of 9 C.F.R. § 201.42(c) on not less than three separate occasions.

137.    Defendants nevertheless continued to hold livestock auctions in spite of the significant shortages in the custodial account.

138.    Defendants' continued operation and sale of livestock when their custodial accounts were overdrawn, which posed a threat that persons who sell or consign livestock to Defendants will go unpaid.

139.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.  7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(6)(iv).

## COUNT VII

### (Misuse of Custodial Funds)

140.    Paragraphs 1-139 are incorporated herein by reference as if fully set out.

141.    Withdrawals from the custodial account for consignor's proceeds are prohibited except for (1) proceeds to the consignor or other person entitled to payment; (2) lawful charges

against the consignment of livestock which the market agency is required to pay; and (3) sums due the market agency as compensation for its services.

142.    Prohibited withdrawal from the custodial account is an unfair practice.

143.    As set forth more fully above, Defendants made prohibited withdrawals from the custodial account.

144.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per prohibited withdrawal.  7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

## COUNT VIII

### (Failure To Sell Consigned Livestock At The Highest Bid)

145.    Paragraphs 1-144 are incorporated herein by reference as if fully set out.

146.    9 C.F.R. § 201.56 requires every market agency to sell livestock consigned to it openly, at the highest available bid, and in such a manner as to best promote the interest of each consignor.

147.    9 C.F.R. § 201 prohibits a market agency and its officers, agents, and employees from purchasing livestock from consignors without first offering the livestock for sale in an open and competitive manner to other available buyers, and then only at a price higher than the highest available bid on such livestock.

148.    Defendants have engaged in unfair or deceptive practices and violated the foregoing statute and regulations by adjusting post-auction the bid for the cattle and altering the scale tickets accordingly on tens of thousands of occasions during the past five years.

149.    Defendants are liable for civil penalties in an amount up to eleven thousand dollars ($11,000) per violation.    7 U.S.C. §§ 208, 213; Pub. L. 101-410; 7 C.F.R. § 3.91(b)(6)(iv).

# COUNT IX

## (Injunctive Relief)

150. Paragraphs 1-149 are incorporated herein by reference as if fully set out.

151. Defendant Calvin Pareo operated as a dealer and market agency without being registered to do so in violation of 9 C.F.R. § 201.10.

152. Defendant Calvin Pareo continues to operate as a dealer without being registered to do so in violation of 9 C.F.R. § 201.10.

153. Defendants were operating as a dealer in buying, marking down, and stealing cattle as he was buying the cattle out of his market and shipping them to a packer as described herein.

154. Defendants have failed to pay for livestock, have failed to remit to the person entitled thereto the net proceeds from the sale of cattle on a commission, have operated while insolvent, all as described herein, thereby injuring the sellers of cattle and undermining the purpose of the PSA—to assure fair competition and protect producers and consumers from unfair and deceptive trade practices.

155. It is in the public interest to enjoin Defendants from operating subject to the PSA and is necessary to effectuate the purposes of the PSA to issue a temporary injunction and restraining order without bond.

156. Defendants should be enjoined from operating as a market agency or as a dealer without registration as required by 9 C.F.R. § 201.10.

WHEREFORE, Plaintiff, United States of America, prays:

1. That, pursuant to Fed. R. Civ. P. 65 and 7 U.S.C. § 228a, a temporary restraining order immediately be issued to prohibit Defendants, their agents and employees, directly or through any corporate or other device, in connection with their operations subject to the PSA,

from operating as a market agency or dealer while livestock sellers and consignors remain unpaid and livestock buyers remain unreimbursed for overcharges;

2.     That Defendants be ordered to:

(a)     Bring Defendant HPL's custodial account in strict conformity with the PSA and sections 201.42 and 201.43 of the Regulations (9 C.F.R. §§ 201.42; 201.43);

(b)     Remit the net proceeds due to consignors within the time period required by the PSA and the Regulations; and

(c)     Remit all fraudulently withheld amounts to sellers and overcharges to buyers.

3.     That a preliminary injunction be entered preventing Defendants from operating as a market agency or dealer until Defendants meet the requirements of paragraph 2.

4.     That the Defendants appear and show cause, at such time and on such date as the Court may direct, why the preliminary injunction prayed for above should not issue;

5.     That Defendants pay to the United States penalties in an amount up to and including eleven thousand dollars ($11,000) per act in violation of the PSA; and

6.     That the United States recover its costs in connection with this action and have such other and further relief as the Court may deem just and proper.

Respectfully submitted.

DAMON P. MARTINEZ
United States Attorney

*Electronically filed 8/5/15*
*/s/ Ruth F. Keegan*
RUTH FUESS KEEGAN
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274  Fax: (505) 346-7205
ruth.f.keegan@usdoj.gov