# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                                    CV 15-680 MCA/WPL

HIGH PLAINS LIVESTOCK, LLC, dba
PRODUCERS LIVESTOCK AUCTION,
MICHAEL FLEN, CALVIN PAREO,
and DARCIE PAREO,

       Defendants.

## ORDER APPOINTING A RECEIVER

       Chief District Judge Armijo entered an Order of Reference in this case on September 2, 2015, directing me to convene proceedings with the parties and determine whether the appointment of a receiver is appropriate, and if it is, to appoint a receiver and define the scope of his or her involvement with High Plains Livestock ("HPL"). (*See* Doc. 18.) Prior to the Order of Reference, the United States moved for a preliminary injunction under Section 408 of the Packers and Stockyards Act of 1921 ("PSA"), 7 U.S.C. § 228a (2012), that would require the Defendants to cease buying or selling livestock.[1] (Doc. 7.) The Defendants, of course, opposed the motion and requested an evidentiary hearing. (Doc. 15.) I held an evidentiary hearing on the issues of 1) whether it is appropriate to appoint a receiver for HPL and 2) the scope of the receiver's duties if it is appropriate to appoint one. (*See* Docs. 46-49.) At the hearing, the United States requested a preliminary injunction that would shut down HPL entirely during the pendency of this case or, in the alternative, that I appoint a receiver to control all aspects of

---

[1] Unless otherwise noted, all future statutory references are to the Packers and Stockyards Act, 7 U.S.C. §§ 181-229c (2012), in Title 7 of the United States Code.

HPL's business. The Defendants agreed that independent oversight was appropriate, but requested that I appoint a special master in the form of a Certified Public Accountant to engage in minimal financial oversight and essentially audit HPL's records on a regular basis.

After the hearing, Mr. and Ms. Pareo were indicted by the State of New Mexico on a total of 139 felony counts of fraud, conspiracy, forgery, racketeering, and conspiracy to commit racketeering. In light of the State charges, the United States supplemented its request and now recommends that I appoint a receiver for the purposes of determining the ongoing viability of HPL. If HPL is viable, the United States requests that I appoint a receiver and require the Defendants to post a bond with the Court. If HPL is not viable, the United States requests that I appoint a receiver to wind down the business. (*See* Doc. 51.)

The Defendants filed a Motion to Strike the letter from the United States and asked that I disregard any information contained therein. (Doc. 52.) The fact that the Pareos have been indicted on state charges is a matter of public record and is appropriate for judicial notice: that is, this fact is not subject to reasonable dispute and is generally known within the court's territorial jurisdiction. Furthermore, the fact of the indictment can be readily determined by sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201(b); *see also United States v. Boyd*, 289 F.3d 1254, 1258 (10th Cir. 2002). Information related to the individuals and entities contacted by the United States is properly before me at this time and I have taken that information into consideration. Accordingly, the Defendants' Motion to Strike (Doc. 52) is denied.

Having considered the briefing, the evidence, and the relevant law, I find that it is appropriate to appoint a receiver to conduct an initial review of HPL's continued viability and, if viable, to take over all aspects of HPL's operations. Additionally, Defendants Calvin and Darcie

Pareo and Michael Flen will have no control over the business, but are permitted to provide advice to the receiver.

LEGAL BACKGROUND

The Grain Inspection, Packers, and Stockyards Administration ("GIPSA"), under the United States Department of Agriculture, is responsible for administering the PSA. The PSA regulates the conduct of packers, stockyards, market agencies, and dealers, among others.[2] §§ 181-229c. A "packer" is "any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter . . . ." § 191. A "market agency" is "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services."[3] § 201(c). A "dealer" is "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." § 201(d). Market agencies and dealers must register with the Secretary of Agriculture ("Secretary"). § 203; 9 C.F.R. § 201.10 (2015).

Market agencies, packers, dealers, and stockyard owners are required to keep accounts and records that "fully and correctly disclose all transactions involved in [the] business . . . ." § 221. Whenever livestock is weighed for the purpose of sale, a scale ticket must be issued which must be serially numbered and used in sequential order. 9 C.F.R. § 201.49(a). The scale tickets must be retained as part of the market agency's or dealer's business records to substantiate each transaction, and must include: 1) the name and location of the weighing; 2) the date of the weighing; 3) the name of the buyer and seller or consigned, or a readily identifiable designation

---

[2] I use the terms "market agency," "livestock auction," "auction," "auction house," and "sale barn" interchangeably.

[3] A "stockyard" is "any place, establishment, or facility . . . conducted, operated, or managed . . . as a public market for livestock producers, . . . market agencies, and buyers, consisting of pens, or other inclosures . . . in which . . . cattle . . . are received, held, or kept for sale or shipment in commerce." § 202(a).

3

thereof; 4) the number of livestock; 5) the kind of livestock; 6) the actual weight of each draft of livestock; and 7) the identity of the person who weighed the livestock, or their signature if required by State law. 9 C.F.R. § 201.49(b).

When a packer, market agency, or dealer purchases livestock, it must remit the full purchase price to the seller before the close of the next business day. § 228b(a). Prior to the purchase or sale of livestock, the parties may agree—in writing—to effect payment in a different manner or on a different timeline, provided that any such agreement is disclosed in the business records of the buyer and the seller, and on the accounts or other documents issued by the purchaser relating to the transaction. § 228b(b).

Market agencies are required to maintain a custodial account for trust funds. § 221; 9 C.F.R. § 201.42(a). Payments made by a livestock buyer to a market agency selling on commission are trust funds. 9 C.F.R. § 201.42(c). By close of business the next business day after an auction, market agencies are required to deposit into the custodial account: 1) all proceeds collected from the auction and 2) an amount equal to the proceeds receivable from the livestock sale that are due from the market agency; any owner, employee, or officer of the market agency; and any buyer to whom the market agency has extended credit. *Id.* The market agency must deposit an amount equal to all the remaining proceeds receivable into the custodial account within seven days of the auction, even if some of the proceeds remain uncollected. *Id.*

Custodial account funds may only be withdrawn to remit the net proceeds due a seller, to pay lawful charges which the market agency is required to pay, and to obtain sums due the market agency as compensation for its services. 9 C.F.R. § 201.42(d). The market agency must transmit or deliver the net proceeds received from the sale to the seller by the close of business on the day after the sale. § 228b(a); 9 C.F.R. § 201.43(a).

Pursuant to the PSA, all market agencies are prohibited from operating while insolvent, i.e., when current liabilities exceed current assets.[4] *See* § 204; *United States v. Ocala Live Stock Market, Inc.*, 861 F. Supp. 2d 1328, 1331 (M.D. Fla. 2012).

A market agency selling on commission is required to sell the livestock consigned to it "openly, at the highest available bid, and in such a manner as to best promote the interest of each [seller]." 9 C.F.R. § 201.56(a). To that end, such a market agency must offer livestock for sale in an open and competitive manner to other available buyers before allowing any of its owners, officers, or employees to purchase consigned livestock. 9 C.F.R. § 201.56(b). When an owner, officer, or employee of the market agency purchases consigned livestock, he or she must do so at a price higher than the highest available bid. *Id.* After an owner, officer, or employee of the market agency purchases consigned livestock, the market agency must disclose on the account of sale the name of the buyer and the nature of the relationship between the buyer and the market. 9 C.F.R. § 201.56(d).

Furthermore, market agencies are required to "establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful." § 208(a). Market agencies must establish rates and charges that are "just, reasonable, and nondiscriminatory." § 206. A schedule of rates and charges for stockyard services, known as the tariff, must be filed with the Secretary and a copy posted for public inspection at the stockyard. § 207(a). Rates and charges may be changed after giving ten days' notice to the Secretary and to the public, or in less than ten days with the Secretary's consent based on peculiar circumstances. § 207(c).

---

[4] For a definition of current assets and current liabilities under the PSA, see 9 C.F.R. § 203.10.

It is unlawful for a stockyard owner, market agency, or dealer "to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with . . . the receiving, marketing, buying or selling on a commission basis or otherwise . . . of livestock." § 213(a). After notice and full hearing, the Secretary may assess a civil penalty of up to $11,000 per violation. § 213(b); 7 C.F.R. § 3.91(b)(6)(iv).

## FACTUAL BACKGROUND

HPL, doing business as Producers Livestock Auction, is a limited liability company located in Portales, New Mexico. HPL is registered with the Secretary as a dealer and as a market agency.[5] Defendant Michael Flen, an electrician by trade, is the sole record owner of HPL. He is not particularly active in HPL's operations, but told state investigators that the Pareos were both salaried employees of HPL. (Ex. 95, Statement of Michael Flen on January 21, 2015, at 6-7.) Ms. Pareo is HPL's corporate secretary. At all relevant times, Mr. Pareo acted under the registrations and bonds of HPL, though he did not receive a salary from HPL, and was not a registered market agency or dealer. Mr. Pareo stated that he acts as an agent for dairymen or ranchers at HPL, and is a friend of Flen's in "a sweat equity deal." (Test. C. Pareo, Tr. Oct. 19, 2015, at 160.) Mr. Pareo represented to HPL's customers that HPL was his business. (Horton Dep. 5:18-23; 6:2-4; Test. S. Kizer, Tr. Oct. 20, 2015, at 5; *see also* Faria Dep. 8:19-9:1 (Faria was unsure how the ownership structure at HPL worked, but knew that the Pareos were involved as either owners or managers).)

HPL operated as a market agency, with Monday and Thursday auctions consisting primarily of cull dairy cattle, until approximately January 21, 2015. Approximately twelve hundred cattle were sold at each of HPL's auctions. Buyers at the auction were assigned a buyer

---

[5] The simple difference between a dealer and a market agency is that a dealer directly buys and sells cattle, whereas a market agency sells on commission and earns money strictly by handling and putting livestock in front of third-party buyers. (Test. Rod Prather, Tr. Oct. 22, 2015, at 37.)

number.[6] HPL auctions typically proceeded as follows: For each head of cattle to be sold, the animal is taken into the HPL auction ring, which is also a scale, the scale is balanced, the animal is weighed, and an automatic scale ticket indicating the date and weight prints. The buyers can see the cattle's weight on the scale. Generally, Mr. Pareo announces a "bid-in" or "set-in" price, which set the floor or started the bidding process. If Mr. Pareo is not present, the auctioneer would state the bid-in price. Several of the buyers testified that Mr. Pareo occasionally set cattle in at a price too high for the market to bear. (Zortman Dep. 30:6-8; Gray Dep. 12:25-13:19; Cranmer Dep. 32:20-33:23.)

Bids are then solicited.[7] Mr. Pareo often participated in bidding on cattle using buyer number 17, listed as HPL market support.[8] Mr. Pareo also used that number to buy for Massa, Seminole Growers, Preferred Beef Group ("PBG"), H&B Packing, and Gibbon's Pack. (Test. Allison "George" Luce, Tr. Oct. 19, 2015, at 100-01.) He purchased between sixty and seventy percent of the cattle at auction (Cranmer Dep. 48:8-22), which is unusual for an owner or manager (*id.* at 64:17-65:16; 83:1-84:5; Gray Dep. 16:8-20, 22:22-23:12). The auctioneer then states the final or winning bid for each head of cattle. Ownership of the cattle passes immediately to the buyer upon conclusion of that sale. For each sale, the auction clerk writes on the scale ticket the cattle's "back tag number," used for identification; whether the price is per

---

[6] The regular buyers at HPL were Duane Zortman, a commission buyer for Booker Pack who also purchases cattle for several feedlots, including Mid-America Feeders; Ernest Gard; Ty Cranmer, a buyer for Caviness Beef who was previously employed by Cargill Beef; and Jim Gray, who replaced Cranmer as the commission buyer for Caviness Beef in January 2014, owns a cattle yard, and rails cattle that he buys for himself. Zortman owns Seminole Growers, a feedyard which was operational until mid-2013, but for which he has not purchased cattle since mid-2013. (Zortman Dep. 78:1-3, 16-25.) Other buyers included Mike Templin, Romero Lopez, Dusty Elkins, and Willie Hudson.

[7] The bids taken on cattle are per pound. Bids can also be referenced as per hundred pounds or "hundredweight." For example, $1.02 per pound may be referenced as $102 "a hundred" or "a hundredweight." When bidding by the hundredweight, "one and a quarter" means $100.25, not $125.

[8] "Market support" is an account used by auctions to purchase cattle when the operator of the auction feels that the cattle did not bring enough money at auction. The operator uses this account to buy the cattle back to support the market and the sellers. (Test. R. Prather, Tr. Oct. 22, 2015, at 68-69.)

hundredweight or per head; any abnormal physical condition of the cattle; the amount of the winning bid; and the number assigned to the buyer with the high bid. On occasion, Mr. Pareo would instruct the auction clerk to mark the sale price at a higher amount than the final bid. (Test. Lynette Fish, Tr. Oct. 19, 2015, at 72.) Mr. Pareo keeps track of which cattle get bid on by using tally marks on his buyer cards during the auction. The entire auction process takes approximately thirty seconds to one minute per head of cattle. Cattle were not often "passed out," or PO'd, at HPL.[9] (Cranmer Dep. 77:16-78:7; Gray Dep. 30:5-10; Zortman Dep. 75:19-76:10.) When cattle are PO'd, the auctioneer is supposed to announce the PO immediately and the associated scale ticket would not have a buyer number or a purchase price because the cattle was not actually bought. (Gray Dep. 28:9-25, 30:1-4.)

In the event that an auction clerk makes a mistake writing down the final bid on a scale ticket, the auction clerk strikes out or marks-through the original price and enters the correct price above or below the stricken price. (Test. Fish, Tr. Oct. 19, 2015, at 32-33 (see Ex. 32 for an example of a ticket that was amended by Fish at the auction (Tr. Oct. 19, 2015, at 35-38)).) Even if it were later discovered that the auction clerk wrote down a number incorrectly, the auction clerk would not go back and change a scale ticket after the auction. (*Id.* at 34.) Auction clerks do not attempt to alter the price on the ticket instead of scratching out the erroneous information. (Test. Luce, Tr. Oct. 19, 2015, at 94.)

The scale tickets are then taken from the auction ring to the adjacent HPL office, where HPL employees, including Allison "George" Luce, enter the information into HPL's system. HPL's software requires the office staff to enter the information twice to ensure accuracy. The record of an individual scale could be changed, even after the scale ticket has been entered into

---

[9] The term "passed out" or "PO'd" means that a cattle was run through the auction, the cattle did not draw as much money as the seller wanted, and the seller retained the animal and paid the sale barn the commission fee. (Cranmer Dep. 75:20-76:17.)

HPL's system, by deleting the original sale and reentering the information. (*See id.* at 116.) After entering information into the system, HPL produces invoices for all of the sellers and all of the buyers at the auction. The invoices include back tag numbers, buyer and seller identification, auction price, weight, and total price. Seller invoices also include qualifying deductions, such as HPL's $21.00 per-head commission charge, and a statement of net remittance. (*See, e.g.*, Ex. 34 (seller invoice to Seller 62 Opportunity Dairy, dated October 18, 2014).)

If buyers had questions about something on their invoice, they were directed to Ms. Pareo. When scale tickets included an error, this conversation may result in HPL staff altering the record of the transaction in HPL's software. (Test. Luce, Tr. Oct. 19, 2015, at 118-19.) Staff would not, however, alter the scale tickets. (*Id.*)

With regard to cattle that were not bid on at auction, Mr. Pareo used buyer number 17 to purchase those cattle and directed Ms. Pareo to alter those scale tickets after the auction.[10] (Test. Calvin Pareo, Tr. Oct. 19, 2015, at 185.) Mr. Pareo instructed Ms. Pareo on "what [those cattle] should average." (*Id.*) It is impossible to tell from HPL's records which cattle HPL purchased at auction and which were purchased at this later determined price. (*Id.* at 247.) At all relevant times, HPL has acted as a dealer when purchasing cattle after the auction at the price determined by Mr. Pareo. (*Id.* at 248.) Cattle purchased by HPL were either sold to other buyers or "railed"—sold directly—to packers. The check from the packer came directly to HPL and was not distributed to the original sellers. Several sellers were unaware that HPL was purchasing cattle as a dealer and railing the cattle itself. (Test. S. Kizer, Tr. Oct. 20, 2015, at 25; Horton Dep. 25:15-25, 26:10-18.)

---

[10] Exhibit 35 includes hundreds of scale tickets from HPL auctions. Some have been altered, some have not.

Cattle would occasionally die at HPL's facility after auction. Non-HPL buyers were still billed for the dead cattle. If a head of cattle that Mr. Pareo purchased at auction died during the night, HPL staff would go back and delete the sale, mark the cattle as passed out, and shred the associated scale ticket, at the direction of the Pareos. (Test. Luce, Tr. Oct. 19, 2015, at 127-29.)

Approximately one to two days after the auction, HPL staff, at Ms. Pareo's direction, would print checks for the sellers. HPL staff would put the checks in envelopes, put stamps on some of the envelopes, and then put the checks back in a drawer in the HPL office. At Ms. Pareo's direction, checks were sent out several days to several weeks after the auction. (*Id.* at 122-125.) Checks were not regularly mailed by the close of business on the day after an auction. (*Id.* at 125; Test. Carlos Villalpando, Tr. Oct. 20, 2015, at 113 (testifying that HPL paid buyers approximately ten days after the auction).) Nelson Faria, a dairyman who jointly owns and operates Faria Brother's Dairy, stopped sending cull dairy cattle to HPL because it took too long for HPL to remit payment, often taking several weeks. (Faria Dep. 8:6-15, 68:23-69:5.)

The buyers would receive invoices from HPL and separate invoices, or knock sheets, from their employers—the packers. HPL usually gave out buyer invoices the night of the sale, but it sometimes took more than a day to send invoices out. (Zortman Dep. 44:13-45:4.) It is not uncommon, in a load of cattle, for the back tag to fall off one or two cattle. However, as 2014 went on, more and more cattle from HPL were missing their back tags. (Gray Dep. 46:17-47:9.) Without the back tag, buyers have difficulty determining whether the cattle they purchased were the same cattle they received. (Gray Dep. 51:12-16.) Buyer invoices include metal ear tag information, which is the federal identification tag affixed to most dairy cattle. However, buyers could not see the metal ear tag during auction and would not have time to track those numbers.

10

Accordingly, it is almost impossible for a buyer to tell whether a back tag has been moved from one cattle to another based solely on the metal ear tag number. (Gray Dep. 94:11-95:7.)

Neither sellers nor buyers ever see the scale tickets, and neither has an effective method of double checking the information received from HPL about how cattle are sold at auction. (Faria Dep. 12:3-6.)

HPL's records contain myriad abnormalities.[11] For example, cattle with back tag number 5232 sold at auction to buyer 17 for $58.50 per hundred weight (*see* Ex. 94 at 3, invoice number

---

[11] Abnormalities in HPL's records are pervasive. I do not cover every discrepancy in this Order. Not all of the records submitted here have been altered, but at least one scale ticket in each exhibit has been noticeably changed. Invoice and scale ticket examples include: Zortman's purchases on March 9, 2014 (Ex. 5); Faria's cattle sold on March 27, 2014 (Ex. 20); cattle purchased on March 27, 2014, by Gard Cattle #2 (Ex. 57), Gard Cattle and Mathews Dairy (Ex. 58), Caviness Packing and Gray (Ex. 59), PBG (Ex. 60), Zortman on behalf of Mid-America Feeders and American Cattle (Ex. 61), and Texstein Feeders and Western Cattle (Ex. 62); cattle purchased by HPL Market Support, Seminole Growers, Massa Cattle #2, and Massa Cattle on March 28, 2014 (Ex. 60); Creekside Dairy's cattle sold on March 28, 2014 (Ex. 97); cattle purchased on April 3, 2014, by Gard (Ex. 82), Gard Cattle and Gard Cattle #2 (Ex. 83), Mathews Dairy (Ex. 83), Caviness Packing (Ex. 84), PBG (Ex. 85), American Cattle (Ex. 86), Willie Hudson (Ex. 87), and Western Cattle (Ex. 88); cattle purchased on April 4, 2014, by Zortman (Ex. 86) and Texstein Feeders (Ex. 88); cattle purchased on April 5, 2014, by Seminole Growers, HPL Market Support, Massa Cattle, and Massa Cattle #2 (Ex. 85); cattle purchased on April 7, 2014, by Gard Cattle (Exs. 70, 76), Mathews Dairy (Ex. 70), Gard Cattle #2 (Ex. 77), Caviness Packing (Ex. 78), American Cattle (Ex. 80), and Willie Hudson (Ex. 81); cattle purchased on April 8, 2014, by Mid-America Feeders (Ex. 80) and PBG, Massa Cattle, and Seminole Growers (Ex. 79); cattle purchased on April 9, 2014, by Massa Cattle #2 (Ex. 79); cattle purchased on April 10, 2014, by Gard Cattle #2 (Ex. 69), Gard Cattle and Mathews Dairy (Ex. 70), Gard (Ex. 70), Gray and Caviness Packing (Ex. 71), PBG (Ex. 72), American Cattle (Ex. 73), and Willie Hudson and Willie Hudson #2 (Ex. 74); cattle purchased on April 11, 2014, by Mid-America Feeders (Ex. 73), Texstein Feeders (Ex. 75), and Seminole Growers, HPL Market Support, Massa Cattle, Massa Cattle #2, and Richard Pope (Ex. 72); cattle purchased on April 14, 2014, by Gard (Ex. 63), Gard Cattle (Ex. 64), Caviness Packing (Ex. 65), Willie Hudson (Ex. 68), and Mid-America Feeders and Walnut Creek Cattle (Ex. 67); cattle purchased on April 15, 2014, by PBG, Massa Cattle, and HPL Market Support (Ex. 66); Duane Zortman's purchases on August 18, 2014 (Ex. 3); Las Uvas Valley Dairy's ("Las Uvas") cattle sold on September 23, 2014 (Ex. 27); cattle sold on November 4, 2014, by Milking Natural and Midway Land and Dairy (Ex. 94); cattle purchased on November 4, 2014, by Seminole Growers (Ex. 94); a hot weight sheet from H&B Packing to HPL on November 5, 2014 (Ex. 94); Route 77's cattle sold on November 8, 2014 (Ex. 49); cattle purchased by HPL on November 8, 2014 (Ex. 50), and railed to H&B Packing (Ex. 51); Faria's cattle sold on November 18, 2014 (Ex. 19); Duane Zortman's purchases on November 25, 2014 (Ex. 4); Las Uvas's cattle sold on December 1, 2014 (Ex. 29); Seminole Growers' purchases on December 3, 2014 (Ex. 7); Las Uvas's cattle sold on January 12, 2015 (Ex. 28); Faria's cattle sold on January 19, 2015 (Ex. 18); Seminole Growers' purchases on January 16, 2015 (Ex. 6); and cattle sold on January 19, 2015, by Las Uvas (Ex. 31) and T J Dairy (Exs. 38-39).

245113), but was invoiced on November 4, 2014, to seller Milking Natural as being sold to buyer 18, which is the buyer number for Seminole Growers (*id.* at 4). Seminole Growers is a feedyard belonging to Duane Zortman. (Test. C. Pareo, Tr. Oct. 19, 2015, at 245.)

The buyer invoice for Seminole Growers dated November 4, 2014, indicates that Seminole Growers purchased cattle with back tag number 5043 (Ex. 94 at 6), even though the scale ticket and seller invoice indicate that Mr. Pareo bought that cattle for HPL on number 17. Seminole Growers has not been operational since mid-2013 and no cattle have been purchased by or on behalf of Seminole Growers since that time. (Zortman Dep. 78:21-80:6.)

Similarly, cattle with back tag number 1814 on invoice number 260237 appears to have sold for an altered price of $90.00 per hundredweight to buyer 17, Mr. Pareo. (Ex. 28.) Cattle 1814 then shows up on the buyer invoice for buyer 39, Massa Cattle #2 at P56195, for $90.00 per hundredweight at a total cost of $1,309.50. (*Id.*)  The buyer invoice shows that cattle 1814 had metal ear tag number 85VMT0969. (*Id.*) PBG issued a Customer Settlement Sheet to HPL that includes cattle with metal ear tag number 85VMT0969. PBG paid HPL $1,434.24 for that cattle, a difference of over $100 from what HPL paid to the consignor, Las Uvas Dairy.

Scale tickets were often altered to decrease the price. For example, cattle with back tag number 626 was purchase by Mr. Pareo on buyer number 17 for a clerked price of $75.00 per hundredweight that was later altered, by someone other than the clerk, to $45.00 per hundredweight. (Test. Fish, Tr. Oct. 19, 2015, at 39-40; Ex. 33, serial number 240642.) This cattle is listed on the seller's invoice as having been purchased by buyer number 18, Seminole Growers. (Ex. 34.)

Sometimes, scale tickets appeared altered to increase the price. (*See* Exs. 3, 27; Horton Dep: 8:15-13:4.) Other times, the invoice price differed from the scale ticket price and the scale

ticket was not altered. (*See* Ex. 18, cattle with back tag number 4620 on invoice 263262, Bates stamp RCDA011281, sold for $80.00 per hundredweight to buyer 17, but was invoiced to the seller, Faria Brother's Dairy, as having sold for $60.00 per hundredweight to buyer 18, as seen on S039721, Bates stamp RCDA010625; Ex. 31, cattle with back tag number 3996 on invoice 262444 sold for $100.00 per hundredweight to buyer 17, but was invoiced to the seller, Las Uvas Dairy, as having sold for $90.00 per hundredweight to buyer 39, as seen on S039733; *see also* Ex. 37; Test. R. Prather, Tr. Oct. 22, 2015, at 74-76 (explaining that many of the scale tickets from the January 19, 2015, sale did not match the invoices sent to the sellers).)

On at least one occasion, Mr. Pareo using buyer number 17 purchased a head of cattle for $1 that was marked as dead on both the buyer's and seller's invoices, but was listed on a packing house invoice from H&B Packing as weighing 664 pounds on the rail, with a total of $1,487.36 remitted to HPL. (*See* Exs. 49-51; Test. R. Prather, Tr. Oct. 22, 2015, at 79-80.)

When presented with evidence of these alterations, buyers and sellers both testified that neither HPL nor the Pareos had permission or authorization to alter the purchase price for cattle sold at auction. (Zortman Dep. 46:20-47:3; Faria Dep. 14:25-15:15, 33:1-5; Cranmer Dep. 71:1-6; Dean Horton Dep. 38:21-39:24, 42:13-23.)

Outside of auction records and scale tickets, HPL's records included checks improperly paid to various parties. HPL paid Cutter Pareo, the Pareos minor child (under the age of 12), for trucking services rendered on at least nine occasions in October and November 2014. (Ex. 52, Bates stamps RCDA 134312-134320; Test. R. Prather, Tr. Oct. 22, 2015, at 80-81.) HPL also paid Cutter Pareo significant sums from the custodial account. Check 30285, dated December 27, 2013, and paid on January 22, 2014, was made out to Cutter Pareo for $3,275.45. (Ex. 53.)

Another HPL custodial check paid on April 25, 2014, was made out to Cutter Pareo for $13,438.75. (*Id.*)

Similarly, Luce worked at HPL for approximately four years. At some point, Ms. Pareo indicated that Luce was getting a raise, but did not want Luce to have to pay additional taxes. Ms. Pareo offered to pay Luce's truck payment, from the custodial account, as her raise. (Ex. 90, check for $350 from HPL to American Heritage, dated March 19, 2014; Ex. 91 (check dated April 23, 2014); Ex. 92 (check dated May 23, 2014); Test. Luce, Tr. Oct. 19, 2015, at 84-85.)

Zortman sometimes made undocumented short-term loans to HPL—usually when his clients were late paying their bills—ranging from $50,000 to $125,000. (Zortman Dep. 41:13-43:23.) On at least one occasion, one of Zortman's checks to HPL was submitted twice and deposited into two separate HPL accounts. (*Id.* at 84:10-90:19; Ex. 8.)

Rod Prather, a resident agent with GIPSA who is responsible for oversight and regulation investigation of livestock markets and dealers in the region, first encountered HPL and the Pareos in 2009. Prather and another GIPSA agent conducted a custodial review of HPL's operation, which resulted in a notice of violation for shortages in HPL's custodial account. (Test. R. Prather, Tr. Oct. 22, 2015, at 30-32.) During the 2009 review, Agent Prather and Ms. Pareo had a conversation about HPL's dealer activities and the fact that HPL was purchasing cattle at auction as a dealer without disclosing that these were dealer purchases. (*Id.* at 33.) He informed Ms. Pareo that the purchase price for these dealer purchases must be paid into the auction's custodial account by the close of the next business day, per regulation. (*Id.* at 34.)

Agent Prather conducted another custodial review of HPL in May 2013. Agent Prather found two large custodial shortages—approximately $700,000 and $300,000, respectively—that were more than thirty days apart. (*Id.* at 38-43.) Ms. Pareo informed Agent Prather that some of

14

the feedyards had not yet paid for their cattle, which resulted in the shortages. (*Id.*) GIPSA documented the shortages in a formal case file and assessed penalties to HPL. (*Id.*)

During the May 2013 review, Mr. Pareo spoke with Agent Prather about HPL's bidding practices at auction. Mr. Pareo said that several buyers—including Carl Peterson, Mick Massa, and PBG—had standing orders with HPL, such that Mr. Pareo bid on the cattle but the true buyer was the third-party. (*Id.* at 40-41.) Agent Prather confirmed some of this with the procurement manager at PBG, which satisfied his concerns at the time. (*Id.* at 41-42.)

In December 2013, Agent Prather conducted another follow-up custodial review and found a shortage in HPL's custodial account of approximately $150,000. (*Id.* at 44.) Ms. Pareo admitted to Agent Prather at the start of the review that HPL's custodial account would be short. (*Id.* at 45.) Agent Prather noted some irregularity in the way that Massa Cattle and Massa Cattle #2 paid for cattle. (*Id.* at 46-47.) He checked with another GIPSA agent—familiar with Mick Massa's payment practices—who agreed that the transactions at HPL seemed odd. (*Id.* at 47.) Agent Prather submitted documentation about the December 2013 custodial shortage alongside the unsettled May 2013 shortages. (*Id.* at 48.)

On or about November 10, 2014, Ms. Pareo signed a Civil Penalty Stipulation Agreement on behalf of HPL, dated October 23, 2014, to resolve allegations regarding shortages found in HPL's custodial account on March 29, April 30, and November 29, 2013. HPL paid a $6,600.00 fine.

Agent Prather again reviewed HPL's custodial account on December 2, 2014. HPL's custodial account appeared to be solvent. (*Id.* at 50.) However, Agent Prather discovered scale tickets that looked altered. (*Id.* at 51-52.) He noticed that nearly all of the apparently altered scale tickets were for livestock purchased by Mr. Pareo using buyer number 17 and all of the prices on

those scale tickets were lowered. (*Id.* at 52.) Following the December 2014 review, Agent Prather determined that on October 31, 2014, HPL's custodial account was short $724,005.82; short $683,927.43 on February 4, 2015; and short $662,163.26 on February 27, 2015. (*Id.* at 101.)

A law enforcement task force involving personnel from the New Mexico Livestock Board ("NMLB"), GIPSA, and the Roosevelt County District Attorney's Office executed a search warrant on HPL's premises on January 21, 2015. The Pareos gave statements to the police on the day of the search warrant. (Exs. 96, 99.)

Mr. Pareo received *Miranda* warnings before speaking with state investigators, acknowledged that he understood his rights, and signed a *Miranda* waiver. (Ex. 96, Statement of Calvin Pareo on January 21, 2015, at 2-4.) He said that he did not earn a salary or paycheck from HPL, but that Ms. Pareo drew a salary from the business. (*Id.* at 34, 82.) Mr. Pareo told state investigators that he buys cattle for HPL's market support and will rerun the cattle or sell them, but that he also purchases for absentee buyers like PBG. (*Id.* at 8-9.) He admitted to guaranteeing sellers that they would make more money, on average, by selling their cattle through HPL. (*Id.* at 43.)

When confronted with scale tickets altered to reduce the purchase price, Mr. Pareo said the altered scale tickets "look[] like somebody is out to sabotage [HPL] and getting less for the cow than what they are [worth.]" (*Id.* at 51-52.) He affirmatively stated that he was not instructing anyone at HPL to alter scale tickets and did not know what was going on. (*Id.* at 54, 84-85, 118.) Mr. Pareo said that he had "no idea" what was happening with the scale tickets. (*Id.* at 65, 73.) He told investigators that he was in the process of installing cameras at HPL's

16

facilities, which could also be used to determine who was altering the scale tickets. (*Id.* at 103.) Mr. Pareo said that he did not understand who would be altering scale tickets. (*Id.* at 115.)

Ms. Pareo confirmed that Mr. Pareo did not draw a salary from HPL, mostly because he was working to pay Flen back for help with prior financial difficulties. (Ex. 99, Statement of Darcie Pareo on January 21, 2015, at 18.) Ms. Pareo indicated that Mr. Pareo would eventually draw a salary. (*Id.*) She also confirmed that Mr. Pareo buys cattle for other people, but purchases cattle for HPL when there are no bids above the set-in price. (*Id.* at 28-29.)

With regard to scale tickets, Ms. Pareo told state investigators that between two and four people enter scale tickets into HPL's system during each auction. (*Id.* at 20.) During that process, HPL's office staff tries to document any abnormalities with the cattle so that they can answer any questions that arise. (*Id.* at 20-21.) Ms. Pareo said that she would initial the scale ticket if she ever found and corrected a mistake. (*Id.* at 45.) Ms. Pareo affirmatively stated that she would not make changes like those seen on the altered scale tickets. (*Id.* at 49.)

Ms. Pareo said she gives purchase invoices to most of the buyers the night of the sale and prints most of the checks for the sellers the next morning. (*Id.* at 25-26.) She said that altered scale tickets with decreased prices could only benefit the buyers, but that it does not make sense because the buyers are not present to alter the scale tickets. (*Id.* at 55.) Ms. Pareo also said that she "should have noticed" someone altering the scale tickets and that the tickets were "bizarre." (*Id.* at 55.)

When asked by state investigators, Ms. Pareo affirmatively stated that no one told her to alter scale tickets or to change computer entries, except for obvious errors caught by the buyers. (*Id.* at 62-63, 71.) She then said, "I don't know who would do this. . . . I don't know who would do this to me." (*Id.* at 70.)

17

The United States filed its complaint for injunctive relief and civil penalties on August 5, 2015. I held an Evidentiary Hearing on October 19, 20, 22, and 28, 2015.[12] (Docs. 46-49.)

Luce identified several scale tickets from HPL auctions that appeared to be altered in a manner other than alterations done by the auction clerks. (Test. Luce, Tr. Oct. 19, 2015, at 107-17; *see* Ex. 3 (serial number 226302, back tag 5731); Ex. 4 (serial number 250538, back tag 1335); Ex. 5 (serial number 201600, back tag 4597); Ex. 38 (serial number 262689, back tag 4175).) Luce testified that she had never seen this type of alteration when entering scale tickets into HPL's computer system after an auction. In fact, the alteration to the scale ticket with serial number 201316, back tag 4190, was in Ms. Pareo's handwriting. (Test. Luce, Tr. Oct. 19, 2015, at 112-13; Ex. 5.) The first time Luce saw a ticket altered in this manner was at the end of January 2015, when she was taken in for questioning for by a Curry County Assistant District Attorney in Clovis, New Mexico. (Test. Luce, Tr. Oct. 19, 2015, at 115.)

Mr. Pareo testified that he started HPL as a joint venture with Flen and Ms. Pareo, on the agreement that the house payment, electric bills, and their children's medical bills were paid by HPL as part of Ms. Pareo's employment. (Test. C. Pareo, Tr. Oct. 19, 2015, at 16, 171-73.) As part of his employment, Mr. Pareo presented, but did not buy, cattle at HPL auctions. (*Id.* at 161.) Mr. Pareo later said that he bought cattle at HPL auctions using number 17 for absentee buyers, including PBG, a trader named Dean Yorton, Mick Massa, and Duane Zortman. (*Id.* at 164-65, 167.) Mr. Pareo clarified that when he purchased cattle for PBG, sometimes he would purchase the cattle as PBG's agent, and other times he would purchase the cattle for HPL that he

---

[12] The Defendants filed a motion in limine before the evidentiary hearing. (Doc. 43.) I orally denied the motion the morning of October 19, 2015. (*See* Doc. 46.) I heard four days of live testimony, reviewed five deposition transcripts, and received hundreds of pages of exhibits into evidence. I considered all of this information, but do not repeat all of it here. I provide examples of misconduct and abnormalities, but do not discuss every instance of misconduct given the pervasive nature of HPL's violations.

would turn around and sell to PBG. (*Id.* at 165.) When cattle were not bid on by other buyers, Mr. Pareo would purchase that cattle using buyer number 17 and essentially swap the cattle over to the dealer-side of HPL's operation: ship that cattle directly to packinghouses. (Test. C. Pareo, Tr. Oct. 20, 2015, at 190-91.) Accordingly, he was only the "buyer" for some of the cattle with buyer number 17 listed on the scale ticket, even though he was the person who bid on the cattle. (Test. C. Pareo, Tr. Oct. 19, 2015, at 178.) For cattle swapped over to the dealer-side of HPL's operation, HPL would retain any proceeds—the price above and beyond the reduced auction price HPL paid to the sellers—from the railed cattle.

Mr. Pareo said that scale tickets accurately reflected what happened at the auction with regard to cattle that sold, but not with regard to cattle that did not sell and were placed on number 17. (*Id.*) Mr. Pareo said he knows which cattle sold and which did not. (*Id.*) However, he testified that he was unable to tell, based on HPL's records, who the real buyer was for a particular head of cattle when the records contained conflicting information. (*Id.* at 245.)

Mr. Pareo admitted that he knew the scale tickets at HPL were being altered. (*Id.* at 180-81.) He also admitted that he told state investigators, when confronted with altered scale tickets in January 2015, that it looked "like a sabotaging deal" and that someone was out to harm the Pareos and HPL. (*Id.* at 183.) Mr. Pareo stated that he had affirmatively misrepresented what happened at HPL and was "[a]pparently not" telling the truth to state investigators. (*Id.* at 184.) Furthermore, Mr. Pareo admitted that he instructed Ms. Pareo to alter scale tickets for buyer number 17, but told state investigators that he did not give such instructions. (*Id.* at 186.) Mr. Pareo testified that the scale tickets for cattle that actually sold at auction were accurate reflections of the activities in the sale ring, but the scale tickets for the cattle that did not sell were not accurate reflections of the auction. (*Id.* at 198.) Mr. Pareo considered these other

19

transactions, involving the cattle that were not bid on at auction, to be part of HPL's dealer business. (Test. C. Pareo, Oct. 22, 2015, at 18.) When HPL purchased cattle at auction as a dealer, it then railed cattle and retained the rail price rather than remitting those proceeds, less allowable costs, to the seller. By his estimate, Mr. Pareo instructed scale ticket alterations on seventeen percent of the cattle at HPL. (Test. C. Pareo, Tr. Oct. 19, 2015, at 218.) HPL was purportedly able to get $5-$6 per hundredweight more for cattle at the packinghouses than the dairymen would be able to get by shipping cattle directly. (Test. C. Pareo, Tr. Oct. 22, 2015, at 28.) Neverless, Mr. Pareo reduced the purchase price for cattle he purchased directly by $8-$10 per hundredweight. (*Id.*) Mr. Pareo admitted that he did, in fact, have something to gain by altering the scale tickets with buyer number 17, but denied instructing Ms. Pareo to increase the price on scale tickets for other buyers. (Test. C. Pareo, Tr. Oct. 19, 2015, at 204-05, 228-29.)

According to Mr. Pareo, he gets to unilaterally determine what each head of cattle sells for because he is the sellers' agent and ninety-five percent of the sellers agreed to this arrangement. (*Id.* at 203, 206.) Mr. Pareo stated that he reduced these agreements to writing in approximately 2010. (*Id.* at 264.) He determined this unilateral price by "researching the market on what other sale barns are getting [and what] other packing houses are paying [for similar cattle.]" (*Id.* at 220.) All other cattle buyers are bound by the price bid at auction. (*Id.* at 204.)

Mr. Pareo did not "feel it was important to be honest and straightforward with the state investigators," whom he believed to be police officers. (*Id.* at 191.) At the time of the interview and the search warrant, Mr. Pareo did not "feel like [he had done] anything wrong" and did not "think [he] should let out [his] marketing strategies to just anybody." (*Id.* at 191.) He then said that he was not honest with the state police because he did not have a lawyer, even though he received *Miranda* warnings and declined an attorney. (*Id.* at 200.) Mr. Pareo later stated that he

was not honest with state investigators because "[t]he New Mexico Livestock Board [had] targeted [HPL] for five years over numerous things," NMLB members were present during questioning, and Mr. Pareo was not going to speak with the NMLB without the advice of counsel. (*Id.* at 248-49.) Finally, Mr. Pareo attempted to explain, during questioning by his attorney, that he was not honest with state investigators because he considered HPL's operations to be marketing strategy and proprietary business information that was valuable to him and his customers. (Test. C. Pareo, Tr. Oct. 20, 2015, at 204-07.)

Mr. Pareo stated that he spoke with Agent Prather about HPL's marketing strategy in 2013. (*Id.* at 201.) He explained the strategy to Agent Prather and Agent Prather understood. (*Id.* At no time did Agent Prather inform Mr. Pareo or HPL that these practices needed to stop. (*Id.* at 202.) Agent Prather allegedly told Mr. Pareo that he—and GIPSA—knew that prices for cull dairy cattle were depressed in Eastern New Mexico. (*Id.*)

Ms. Pareo testified that she made changes to scale tickets "on occasion." (Test. D. Pareo, Tr. Oct. 28, 2015, at 52.) She explained, however, that several of the buyers agreed to after-auction increases to the purchase price for some cattle in exchange for HPL covering the cost of some of the dead cattle for those buyers. (*Id.* at 59-61.) Regardless of how the cattle were actually sold—at auction or direct sales on the dealer side—HPL could not remove the $21.00 commission per head. (*Id.* at 77.) Furthermore, Ms. Pareo said that she changed the scale tickets to comply with GIPSA regulations and information received from Agent Prather that the auction is required to keep a true record of everything that occurred. (*Id.* at 81.) With regard to why cattle were purchased or PO'd to Mr. Pareo as buyer number 17, and then "moved" to other buyers for invoicing, Ms. Pareo explained that HPL had an agreement with these buyers in order to protect the market. (*Id.* at 84-85.)

Like Mr. Pareo, Ms. Pareo testified that she did not feel the need to be honest with state investigators. (*Id.* at 61-63.) In fact, Ms. Pareo admitted lying to state investigators. (*Id.* at 66.)

Agent Prather had the opportunity to review HPL's records after the January 21, 2015, search warrant. (Test. R. Prather, Tr. Oct. 22, 2015, at 58.) Nowhere in HPL's records did Agent Prather find any kind of written agreement between Mr. Pareo and the dairies that would allow Mr. Pareo or HPL to deviate from the statutory requirements of the PSA. (*Id.*)

Mr. Pareo thought that buyers at HPL were engaged in collusive buying practices. Mr. Pareo claimed that he reported this collusion to Agent Prather multiple times in the several years leading up to the January 2015 search warrant. (Test. C. Pareo, Tr. Oct. 19, 2015, at 212-14.) Mr. Pareo acknowledged that Agent Prather would probably deny these conversations, but insisted that Agent Prather would be lying. (*Id.* at 213.) The buyers, however, disagreed and testified that there were no collusive activities. (Cranmer Dep. 79:1-11.) Agent Prather did not conclude that buyers at HPL were colluding. (Test. R. Prather, Tr. Oct. 22, 2015, at 68.) Agent Prather testified that he did not recall any conversation with Mr. Pareo in which Mr. Pareo reported or alluded to buyer collusion at HPL. (*Id.* at 69-70.)

Tim Allison, a former NMLB Inspector, testified that the NMLB briefly required HPL to have dairy owners sign a form allowing HPL to market their cattle. (Test. T. Allison, Tr. Oct. 20, 2015, at 129; Ex. A.) The NMLB did not require any other auctions to use such a form. (Test. T. Allison, Tr. Oct. 20, 2015, at 129.)

The Defendants submitted statements and affidavits from multiple dairymen stating that the dairymen have an agreement with HPL allowing Mr. Pareo to set in cattle at a certain price, pass the cattle out, and sell cattle at alternative markets. (Ex. K (statements); Ex. M (affidavits).)

The Defendants also submitted affidavits of non-prosecution from the dairymen, stating that they did not wish to participate in the civil action against HPL. (Ex. L.)

One such dairyman, Carlos Villalpando, has done business with Mr. Pareo since approximately 1998. (Test. C. Villalpando, Tr. Oct. 20, 2015, at 59.) Villalpando discussed with and authorized Mr. Pareo to do "[w]hatever he could do" to get the price for cull cattle. (*Id.* at 68.) Villalpando executed an agreement with HPL allowing HPL to "market [his] cattle the best way they see fit. This will pertain to any cattle [the Villalpandos] send to [HPL]." (Ex. A.) In February 2015, he also signed a statement, affidavit, and affidavit of non-prosecution similar to those admitted by the Defendants. (Test. C. Villalpando, Tr. Oct. 20, 2015, at 74-75, 118-19; Ex. B.) Villalpando was not aware of any altered scale tickets or other business practices of HPL when he signed these documents. (Test. C. Villalpando, Tr. Oct. 20, 2015, at 90.) He testified, however, he did not and would not authorize anyone to alter documents or fraudulently create documentation related to his cattle. (*Id.* at 85-86.)

Another dairyman, Jericho Sanchez, also signed a statement, affidavit, and affidavit of non-prosecution. (Test. J. Sanchez, Tr. Oct. 22, 2015, at 199-200.) Sanchez testified that he authorized Mr. Pareo to "adjust" scale tickets in order to sell the cattle. (*Id.* at 207-08.)

HPL's license to operate under the NMLB expired effective December 31, 2014, and the NMLB declined to reissue the license. Flen and Ms. Pareo were arrested in Roosevelt County, New Mexico, on February 9, 2015, for multiple violations of the livestock auction market regulations. HPL essentially stopped functioning as a sale barn on January 19, 2015. HPL continued to accept cattle meant for auction after January 19, 2015, without informing the sellers that HPL was acting only as a dealer and was purchasing the cattle directly. (Faria Dep. 70:14-72:15; Test. C. Villalpando, Tr. Oct. 20, 2015, at 94.)

Presently, HPL continues operations as a livestock dealer under the PSA. The Pareos make all of the decisions regarding the dealer operation. Mr. Pareo is now employed and paid by HPL. (Test. C. Pareo, Tr. Oct.19, 2015, at 160.) HPL purchases approximately one thousand cattle per week from roughly forty dairies. (Test. C. Pareo, Tr. Oct. 20, 2015, at 148.) The Pareos have credit agreements with all of the dairies and dairymen from whom they currently purchase cattle. (Test. C. Pareo, Tr. Oct. 19, 2015, at 234-35; Test. C. Pareo, Tr. Oct. 20, 2015, at 169-70.)

HPL weighs the cattle at the dairy. After getting cattle to HPL's facility and sorting the cattle, HPL reweighs the cattle and sends the dairy an invoice with the ear tag number, an estimated weight per animal, cost per head, the total dollar amount for the cattle, and a check. (Test. C. Pareo, Tr. Oct. 20, 2015, at 165-66.) The check comes out of HPL's country account, which is dedicated only to these transactions. (*Id.* at 166-67.) HPL then sends most of the cattle to PBG or H&B Packing, with whom HPL has standing arrangements for cattle to be slaughtered five or six days a week. (*Id.* at 151-53.)

In addition to current dealer activities, HPL runs a farming operation in which they grow crops on approximately two thousand acres. (*Id.* at 173-74.) HPL leases at least some of the farmland it cultivates. (*Id.* at 175.) HPL also runs trucking operations, in which it hauls cattle from dairies to the HPL facility or to packinghouses, peanut hulls out of peanut factories, hay off the farms, and manure from dairies to farms. (*Id.* at 181.) Finally, HPL raises livestock and runs approximately 1500 cattle through that operation per year. (*Id.* at 182.)

Although HPL now operates as a dealer and not as an auction, Agent Prather expressed continuing concerns about HPL's honesty and ability to comply with the PSA. (Test. R. Prather, Tr. Oct. 22, 2015, at 111-13.) Specifically, Agent Prather worried that HPL could lie about the number of dead cattle, could manipulate the weight of the cattle, or could unilaterally set a price

detrimental to the dairymen. (*Id.*) Agent Prather clarified that, with regard to dealer activities, his concerns about manipulating cattle weights would be assuaged if the cattle were weighed at the dairy and in the presence of an NMLB brand inspector. (*Id.* at 154-56.)

DISCUSSION

There are three overarching questions to be answered: 1) Is the United States entitled to preliminary injunctive relief? 2) If so, is it appropriate to appoint a receiver for HPL? 3) And if a receiver is appropriate, what is the scope of the receiver's responsibilities? The United States contends that HPL, through Flen and the Pareos, repeatedly violated the PSA and attendant regulations by: failing to maintain their custodial accounts; misusing their custodial accounts; failing to maintain accurate and true records; generating false documents; failing to remit the full amount due for livestock; altering sale documents, including scale tickets and seller invoices, for the purpose of avoiding payment of the full amount due for livestock purchased for and on behalf of HPL; and misrepresenting the true purchasers of livestock. The Defendants refute these allegations by attempting to explain their conduct, but provide no evidence to the contrary.

I find, first, that the United States has made an adequate showing that it is entitled to preliminary injunctive relief. Second, appointing a receiver is the only way to allow HPL to continue operating and will provide the most protection for the market and consumers. And finally, because of the pervasive and egregious misconduct under the PSA, the receiver will take over all aspects of HPL's operations. The Pareos may continue to provide technical advice to the receiver, but they and Mr. Flen will have no financial authority, may not have access to HPL's bank accounts, and may not participate in record-making or record-keeping activities.

## I.     Preliminary Injunctive Relief

A preliminary injunction is an extraordinary remedy crafted as an exercise of the court's equitable powers to fit the specific situation at hand. *See Salazar v. Buono*, 559 U.S. 700, 714 (2010) (Kennedy, J., with two Justices concurring and two Justices concurring in the judgment); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  In cases where the governing statute specifically authorizes injunctive relief—a "statutory injunction"—the statute controls. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004); *Ocala Live Stock Market*, 861 F. Supp. 2d at 1335. "As irreparable harm is presumed in a statutory enforcement action, the district court need only find some chance of probable success on the merits." *FTC v. Skybiz.com, Inc.*, No. 01-CV-396-K(E), 2001 WL 1673645, at *8 (N.D. Okla. Aug. 31, 2001) *aff'd* 57 F. App'x 374 (10th Cir. 2003) (unpublished) In other cases, courts engage in a four-factor analysis when considering requests for preliminary injunctive relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (outlining the four-factor analysis).

The United States sufficiently established, under both tests, that it is entitled to such relief.

### A.     Statutory Injunction Under § 228a

Section 228a specifically authorizes a statutory injunction and allows the United States to apply for a temporary injunction or restraining order when it has reason to believe that any person governed by the PSA has

> (a) . . . failed to pay or is unable to pay for livestock, meats, meat food products, or livestock products in unmanufactured form, . . . or has failed to remit to the person entitled thereto the net proceeds from the sale of any such commodity sold on a commission basis; or (b) has operated while insolvent, or otherwise in violation of [the PSA] in a manner which may reasonably be expected to cause irreparable damage to another person; or (c) does not have the required bond; and that it would be in the public interest to enjoin such person from operating subject to this chapter or enjoin him from operating subject to this chapter except under

such conditions as would protect vendors or consignors of such commodities or other affected persons.

When the United States has made such a "proper showing," the Court "shall . . . issue a temporary injunction or restraining order." *Id.*

The United States has presented evidence in the form of deposition and live testimony, HPL's own records and reports, and declarations from GIPSA auditors, establishing that HPL engaged in rampant violations of the PSA. The United States made a proper showing that HPL:

- routinely failed to remit the net proceeds from the auction to the sellers (*see, e.g.*, Test. Luce, Tr. Oct. 19, 2015, at 127-29 (cattle purchased at auction by Mr. Pareo that died before slaughter were not paid for); Test. Fish, Tr. Oct. 19, 2015, at 39-40 (cattle with back tag number 626 sold for $75.00 per hundredweight, but was marked down to $45.00 per hundredweight); Ex. 33 (invoice number 240642); Exs. 49-51 (rail price for cattle HPL purchased at auction "as a dealer" not disclosed and remitted to sellers)), which qualifies under § 228a(a);

- operated while insolvent, as defined by § 204 (*see* Test. R. Prather, Oct. 22, 2015, at 30-32 (HPL's custodial account was short in 2009); *id.* at 38-43 (HPL's custodial account had a combined $1 million shortage in 2013); *id.* at 44 (HPL's custodial account had another shortage in December 2013); *id.* at 101 (Agent Prather found significant shortages in HPL's custodial account in October 2014 and February 2015)), which qualifies under § 228a(b); and

- operated in violation of the PSA in a manner which may reasonably be expected to cause irreparable damage to others, which qualifies under § 228a(b), by:

  i. misusing the custodial account (*see* Exs. 52, 53 (custodial checks made out to Cutter Pareo, the Pareos minor child, for trucking services); Exs. 90, 91, 92 (custodial checks to American Heritage for Luce's truck payment)), a violation of § 221 and 9 C.F.R. § 201.42;

  ii. failing to maintain accurate and true records (*supra*, 11-14, discussing the abnormalities found in HPL's records; Test. C. Pareo, Oct. 19, 2015, at 178, 198, 245 (testifying that HPL's records only partially reflect what happened at auction)), a violation of § 221 and 9 C.F.R. § 201.49;

  iii. generating false documents (*supra*, 11-14, discussing the abnormalities found in HPL's records; Test. C. Pareo, Oct. 19, 2015, at 178, 198, 245 (testifying that HPL's records only partially reflect what happened at auction); Test. D. Pareo, Oct. 28, 2015, at 52, 81 (testifying that she altered records after-auction to make the accurate reflections of what ultimately happened)), a violation of § 221 and 9 C.F.R. § 201.49;

27

iv.    altering sale documents for the purpose of avoiding payment of the full amount due for livestock purchased for and on behalf of HPL (*see, e.g.*, Test. Luce, Tr. Oct. 19, 2015, at 127-129 (testifying that HPL staff would shred scale tickets when cattle purchased by Mr. Pareo died before they could be slaughtered)), a violation of §§ 221 and 228b(a); and

v.    misrepresenting the true purchasers of livestock (*e.g., compare* Ex. 94 at 3, invoice number 245113, marking cattle with back tag number 5232 as being sold to buyer 17, Mr. Pareo, *with* Ex. 94 at 4, the seller's invoice marking cattle with back tag number 5232 as being sold to buyer 18, Seminole Growers), a violation of § 221.

The United States also showed that it is in the public interest to enjoin HPL from operating under the PSA, except under the conditions explained herein. "[T]he [PSA] is designed to . . . prevent potential injury by stopping unlawful practices in their incipiency." *Bowman v. U.S. Dep't of Agric.*, 363 F.2d 81, 86 (5th Cir. 1966) (quotation omitted). I find that HPL and the Pareos have demonstrated an inability to comply with the PSA and a willingness to lie to and intentionally mislead law enforcement and regulatory authorities. Accordingly, I find that it is likely that HPL will continue to violate the PSA if allowed to operate unrestricted. It is, therefore, in the public interest to constrain HPL's operation.

I find that the United States presented evidence sufficient to conclude that there is some chance of probable success on the merits and made a proper showing that it is entitled to a statutory injunction under § 228a.

### B.    Traditional Injunctive Relief

Where a statute does not specifically authorize injunctive relief, a movant seeking preliminary injunctive relief must show that: 1) he is likely to succeed on the merits, 2) he is likely to suffer irreparable harm in the absence of the preliminary relief, 3) the balance of equities tips in his favor, and 4) the injunctive relief is in the public interest. *Winter*, 555 U.S. at 20 (citing *Romero-Barcelo*, 456 U.S. at 311-12). The decision to grant injunctive relief, and how

to craft such relief, is within the sound discretion of the Court. *Id.* (citing *Romero-Barcelo*, 456 U.S. at 312); *see also Skybiz.com, Inc.*, 574 F. App'x at 376.

All four factors weigh in favor of granting preliminary relief. First, as discussed above, the United States presented overwhelming and uncontroverted evidence of rampant violations of the PSA. The United States is likely to succeed on the merits. Second, HPL and the Pareos demonstrate no remorse for their violations of the PSA and no intent to rectify those deficiencies. Instead, the Pareos have shown an absolute willingness to mislead authorities. It is likely that the United States and the cattle market will suffer irreparable harm in the absence of preliminary relief in the form of continued fraud on the market and potential financial upheaval in the livestock industry. Third, the balance of equities tips in favor of the United States. Preliminary relief will not entirely prevent HPL from operating, but will alter the conditions under which HPL does business in order to ensure compliance with the PSA, protect the market and market participants, and facilitate resolution of the pending cases. Any hardship imposed upon HPL by the appointment of a receiver is of its own making due to the systemic disregard of its legal obligations under the PSA. Finally, the PSA is designed to protect the market, which is in the public interest, and HPL has been unable or unwilling to comply with the PSA's requirements. Therefore, it is in the public interest to grant preliminary relief and ensure compliance with the PSA.

Under the traditional four-factor analysis, the United States has shown that it is entitled to preliminary relief.

## II.        Appointment of a Receiver

I find that it is appropriate to appoint a receiver. Although § 228a does not specifically provide for the appointment of a receiver, it does allow the Court to fashion conditions as part of

the statutory injunction. Factors typically considered when appointing a receiver are whether the party seeking the appointment has a valid claim, the probability that fraudulent conduct has occurred or will occur, imminent danger that property will be concealed or otherwise diminished, inadequacy of legal remedies, lack of a less drastic remedy, and the likelihood that appointing the receiver will be more beneficial than harmful. *See, e.g.*, *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993). Most of the cases regarding receivership involve bankruptcy or judgment creditors, but the basic principles apply.

In looking at these factors, each and every factor weighs in favor of appointing a receiver. As discussed above, the United States has a valid claim that HPL systematically violated the PSA in myriad ways. A review of the hundreds of scale tickets admitted into evidence that appear altered, the testimony of auction clerks that they do not fix mistakes in this way, and the admission of the Pareos that they altered scale tickets makes it extraordinarily probable that fraudulent conduct has occurred. The Pareos unrepentant attitude suggests that fraudulent conduct may continue. There is no evidence that HPL is hiding assets or would engage in conduct designed to decrease the value of its existing assets, but it is likely that, unsupervised, HPL would continue to manipulate the market and limit the proceeds available for remittance to cattle sellers. The appointment of a receiver is a harsh remedy, but it is less severe than entering a preliminary injunction preventing HPL from operating at all. Finally, a receiver will be able to terminate all fraudulent conduct at HPL, remedy the deficits in the HPL's custodial account, and create a plan to pay off potential creditors. It is likely that a receiver will do more good than harm. Of course, if HPL decides that it would rather not operate than to do so under a receiver, that is a business decision that will be in accord with the letter and spirit of this Order.

I have considered the factors generally used when deciding whether to appoint a receiver, the evidence, and the case as a whole. I find that it is appropriate to appoint a receiver for HPL.

### III.        Scope of the Receiver's Responsibilities

Determining the scope of the receiver's responsibilities is within the sound discretion of the Court. *See Aviation Supply*, 999 F.2d at 317. As discussed above, I find that HPL has engaged in egregious, systematic violations of the PSA to such an extent that Flen and the Pareos cannot be allowed to independently run the business. Because HPL's dealer activities are intertwined with and under the same corporate umbrella as the farming, trucking, and other activities, all of HPL's business activities will be run by the receiver.

As noted in the United States's  November 12, 2015, letter to me, Johnson Miller & Co. are Certified Public Accountants in Hobbs, New Mexico, that have no affiliation with HPL and are willing to act as a receiver with regard to the financial side of HPL's operations. Johnson Miller is also willing to conduct an initial review to determine HPL's continued viability. (Doc. 51.) I hereby appoint Johnson Miller & Co. as receiver.

The receiver will have two phases of responsibility. First, the receiver will conduct an initial audit and review HPL's finances and activities to determine the continued viability of HPL's ongoing business operations. The receiver will submit a sealed and confidential report to the United States, the State of New Mexico, the Defendants, and the Court after the initial review. The report will explain the receiver's findings and proposed course of action. If the receiver determines that HPL is not viable, or that receivership will be too expensive and will bankrupt the company, the Court will then determine whether the receiver will be responsible for overseeing HPL's winding up. If, however, the receiver determines that HPL is viable as a going concern and receivership will not be financially untenable, the receiver will be responsible for

overseeing all aspects of HPL's operations, including all financial decisions, banking, record-keeping, and regulation compliance. After the initial review, the receiver may hire a manager or propose a co-receiver to oversee the technical aspects of HPL's operations, if the receiver determines that such an arrangement is the most effective method of oversight.

Under no circumstances may the Pareos, individually or as a couple, or Mr. Flen have access to HPL's bank accounts, be responsible for creating records, or have ultimate decision-making authority. The receiver may solicit and consider advice from the Pareos on the technical aspects of running HPL, including cattle pricing, considerations relevant to each dairy, trucking operations, and farming decisions. Additionally, the receiver will comply with the United States and the State of New Mexico in producing any necessary HPL records. The receiver will provide reports to the United States, the State of New Mexico, the Defendants, and the Court on a semi-annual basis, with the first report due on July 1, 2016, that details HPL's current activities, present financial status, and projections for the next six months.

### CONCLUSION

I find that the United States is entitled to preliminary relief both as a statutory injunction and under the traditional four-factor analysis. A receiver is appropriate. Receivership is the least severe remedy available under the circumstances. The receiver will have duties as described above. Johnson Miller & Co. is appointed as the receiver for HPL. Johnson Miller & Co. will submit status updates to the Court every thirty days, beginning on January 15, 2016, until it has finished the initial review.

HPL shall immediately deposit $25,000 with Johnson Miller & Co., and Johnson Miller & Co. will bill against this sum while it completes its initial audit and review. When the deposit

is reduced to $5,000, HPL shall deposit an additional $25,000 with Johnson Miller & Co. to satisfy future costs of the receivership.

       IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge