IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                    No. 1:15-CV-680 MCA/WPL

HIGH PLAINS LIVESTOCK, LLC, dba
PRODUCERS LIVESTOCK AUCTION,
MICHAEL FLEN, CALVIN PAREO,
and DARCIE PAREO,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the following motions: the United States' *Motion for a Preliminary Injunction to Enjoin Defendants from Violating the Packers and Stockyards Act and Memorandum in Support* [Doc. 7] and the *United States' Motion for Appointment of Receiver and/or Co-Special Master or Preliminary Injunctive Relief* [Doc. 153].    The Court, having considered the submissions, the relevant law, and otherwise being fully informed in the premises, hereby **GRANTS** both motions.

## BACKGROUND

The United States filed this action on August 5, 2015, alleging that Defendants[1] committed numerous violations of the Packers and Stockyards Act (PSA), 7 U.S.C.

---

[1] According to the *Complaint*, Defendant High Plains Livestock (HPL) is a limited liability company located near Portales, New Mexico.  [Doc. 1, ¶ 5]  Defendant Michael Flen is the record owner of HPL.  [Doc. 1, ¶ 6]  Defendant Darcie Pareo is HPL's corporate secretary and "manages the administrative and financial operations of HPL." [Doc. 1, ¶ 9]  "Defendant Calvin Pareo is a partner in fact with Michael Flen and

§§ 181 *et seq.*[2]  [Doc. 1]  Shortly after this case was filed, the United States filed a

*Motion for a Preliminary Injunction*, submitting that "[t]he only way to protect all of the

interests harmed by Defendants' practices is to issue an injunction—ordering that

Defendants cease buying and selling livestock."[3]  [Doc. 7, p 2]  The United States relied

on several improprieties by Defendants in seeking a preliminary injunction, all of which

occurred prior to January 21, 2015.  On January 21, 2015, a task force comprised of

Agent Prather from the Grain Inspection, Packers and Stockyards Administration

(GIPSA), individuals from the New Mexico Livestock Board, and the Roosevelt County

District Attorney's office executed a search warrant on the premises of High Plains

Livestock (HPL).  [Doc. 7, p. 8]  Prior to January 21, 2015, Defendants were allegedly

---

manages the livestock operations of HPL.  Defendant Calvin Pareo made all purchases of the livestock and managed all livestock activities."  [Doc. 1, ¶ 8]

[2] On April 11, 2016, this Court dismissed for lack of jurisdiction Counts I through VIII of the *Complaint*.  [Doc. 165]  These Counts sought civil penalties for violations of 7 U.S.C. §§ 208 and 213.  The Court ordered the United States to file a complaint before the Secretary of the Department of Agriculture if the United States wished to pursue those charges.  [Doc. 165, pp. 15-16]  The parties have represented to the Court that the action was filed before the Secretary and that Defendants' answer was due September 22, 2016, but the Court has no other information regarding the status of the action before the Agency.  [Doc. 213, ¶ 13; Doc. 272, p. 29]  Two claims remain pending in this Court: Count IX, the United States' claim that "Defendant Calvin Pareo operated as a dealer and market agency without being registered to do so" [Doc. 1, ¶ 151] and "Defendant Calvin Pareo continues to operate as a dealer without being registered to do so"; [Doc. 1, ¶ 152] and the United States' request for injunctive relief under 7 U.S.C. § 228a  [Doc. 1, pp. 21-22].

[3] Elsewhere in the *Motion* the United States makes statements which suggest that it is not requesting an injunction from operating entirely but rather an injunction from operating except under specific conditions.  For example, the United States submits:  "Defendants should be enjoined from buying and selling cattle until they have paid the defrauded sellers the amount due, and their custodial account is solvent to ensure that the Defendants are financially capable of paying the sellers of cattle the amounts they are due, and have demonstrated compliance with the PSA and regulations."  [Doc. 7, p. 20]

operating a market agency[4] and dealer operation,[5] but after the search was conducted Defendants purportedly began operating solely as a livestock dealer, as described by Magistrate Judge Lynch's *Order Appointing Receiver*.  [Doc. 55, p. 24]

After the United States filed its *Motion for Preliminary Injunction*, the Court held a status conference.    The Court and the parties discussed the possibility of the appointment of a receiver.  [Doc. 14]  The Court referred the matter of appointment of a receiver to Magistrate Judge William P. Lynch.  [Doc. 18]  Magistrate Judge Lynch took four full days of testimony, reviewed five deposition transcripts, and received hundreds of pages of exhibits.  [Doc. 55, p. 18 n.12]  In short, at the hearing, the United States established that Defendants engaged in a practice or pattern of violating the PSA.  One of Defendants' practices was to fraudulently represent that third parties, rather than HPL, purchased cattle, thereby allowing HPL to purchase cattle at a lower price than otherwise required by law.[6]  [Doc. 55, pp. 11-12]  Defendants also altered scale tickets, thus

---

[4] "The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services."  7 U.S.C. § 201(c).  As fully set forth in Magistrate Judge Lynch's *Order Appointing a Receiver,* market agencies must maintain funds in a trust account and follow strict regulations governing selling cattle and the remittance of those commissions.  [Doc. 55, pp. 3-6]

[5] "The term 'dealer' means any person not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser."  7 U.S.C. § 201(d).  Dealers do not sell on a commission, but, like market agencies, must remit the purchase price to the seller before the close of the next business day unless the parties have agreed in writing to a different schedule or manner of payment.  [Doc. 55, p. 4]

[6] "[A] market agency must offer livestock for sale in an open and competitive manner to other available buyers before allowing any of its owners, officers, or employees to purchase consigned livestock. 9 C.F.R. § 201.56(b). When an owner, officer, or employee

misrepresenting to cattle sellers that buyer bids were lower than the amount HPL received from the slaughterhouses. [Doc. 55, pp. 9, 12, 19-21] By doing so, Defendants defrauded sellers of the full value of their livestock and kept the difference for themselves, in addition to keeping the amount it charged for commission. [Doc. 55, pp. 12, 19] Defendants also had repeated shortages in its custodial account, in violation of 9 C.F.R. § 201.42. [Doc. 55, pp. 14-16] Defendants failed to timely transmit proceeds from the sale of cattle to the sellers [Doc. 55, p. 10], in violation of 9 C.F.R. § 201.43(a). Defendants misused HPL's trust fund account, for example, by drafting checks to the Pareos' minor child (under the age of 12) for "trucking services" and by making an employee's vehicle payment from the trust account. [Doc. 55, pp. 13-14] Further, Magistrate Judge Lynch took judicial notice that the Pareos were indicted in state court on 139 counts of felony fraud, conspiracy, forgery, racketeering, and conspiracy to commit racketeering. [Doc. 55, p. 2]

Based on these factual findings, Magistrate Judge Lynch appointed Johnson Miller & Co. as receiver[7] to "conduct an initial audit and review [of] HPL's finances and activities to determine the continued viability of HPL's ongoing business operations." [Doc. 55, p. 31] If the receiver found that HPL was a viable business concern, the

---

of the market agency purchases consigned livestock, he or she must do so at a price higher than the highest available bid. *Id.*" [Doc. 55, p. 5]

[7] After the hearing but before the Magistrate Judge issued his decision, the United States submitted a letter to the Court identifying the companies and individuals the United States attempted to contact regarding its "efforts to find a Special Master." [Doc. 51, p. 1] One of the companies identified was Johnson Miller & Co., which was "interested in acting as Special Master with respect to the accounting/banking side of the business, but expressed concern about pricing cattle and otherwise running the cattle side of the business." [Doc. 51, p. 2]

receiver was to begin "overseeing all aspects of HPL's operations, including all financial decisions, banking, record-keeping, and regulation compliance." [Doc. 55, pp. 31-32] If HPL was not viable, then the receiver was to oversee winding up of the business. [Doc. 55, p. 31] In the alternative, Magistrate Judge Lynch stated that, "if HPL decides that it would rather not operate than to do so under a receiver, that is a business decision that will be in accord with the letter and spirit of this Order." [Doc. 55, p. 30]

Magistrate Judge Lynch entered his *Order Appointing Receiver* on December 8, 2015. Defendants objected on December 11, 2015 [Doc. 60], and also submitted a *Notice and Request for Emergency Hearing* indicating that HPL "decided that it will not operate under a receiver and will discontinue operations." [Doc. 59] The United States responded by stating it had a concern that Defendants were "hiding assets or engaging in conduct designed to decrease the value of its existing assets" and that "Defendants will not pay the dairies for cattle, and thereby cause significant harm to livestock producers and the livestock industry." [Doc. 61, p. 2] The United States thus did not oppose a hearing for the purpose of clarifying whether Defendants "must permit the receiver to oversee any winding up of their cattle dealer business." [Doc. 61, p. 2]

The parties submitted numerous briefs and documents on the issue of the appointment of a receiver and the Court held two hearings and a telephonic status conference. At the first hearing, the Court stated it would allow all parties until December 31, 2015 to file objections to the *Order Appointing Receiver*, and the Court ordered the parties to meet and confer to propose a plan for management of the property until the Court could make a decision. [Doc. 103, p. 4] The parties were unable to reach

a stipulation.  [Id.]  Thus, after a telephonic status conference, on December 23, 2015, the Court appointed an interim receiver, De'Aun Willoughby,[8] to "1) conduct[] a financial review of each of Defendants and report[] to the Court regarding its findings; 2) hold[] title to the property; [and] 3) pay[] such bills as necessary and collecting on such accounts as necessary."  [Doc. 88, pp. 7-8]  In that same *Order*, the Court concluded that further information was needed to determine the best course for winding down the business.  [Doc. 88, ¶ 24]  Ms. Willoughby, however, declined the appointment of receivership, and thus, on December 24, 2015, the Court entered a temporary injunction "direct[ing] Defendants to undertake all reasonable interim measures to preserve assets and maintain the status quo" and enjoining Defendants from "[c]onducting any business as a dealer."  [Doc. 89, pp. 3, 7]

The Court held the second hearing on January 8, 2016.  At that hearing, the Court took testimony from Gayland Cowen and decided to appoint him as Special Master.  The Court asked the parties to submit, for the Court's consideration, their list of recommended responsibilities for Mr. Cowen.  [Doc. 98, p. 49]  Upon receiving the parties' submissions, the Court entered a *Memorandum Opinion and Order* [Doc. 103] and an *Order Appointing Gayland Cowen as Special Master.*  [Doc. 104]  In the *Memorandum Opinion and Order*, the Court overruled-in-part and sustained-in-part Defendants' objections to the appointment of a receiver.  The Court stated the following:

---

[8] De'Aun Willoughby and Gayland Cowen were both identified by Defendants as potential special masters, and they submitted letters of interest to the Court.  [Doc. 74, pp. 28-30]

6

[A]ny receiver [appointed] must have relevant experience, and the record does not indicate that Johnson, Miller & Co. has the requisite experience to run a cattle dealer operation.

Considering the evidence as a whole, the Court concludes that there would be sufficient justification to warrant the extraordinary remedy of the appointment of a receiver prior to the determination of the merits in this case. However, the difficulty which has become clear since December 8, 2015, is that there may not be any individual willing and qualified to act as a receiver in this case. As stated above, the Court appointed Ms. Willoughby as a receiver, but she declined the appointment. At the hearing on January 8, 2016, Mr. Cowen stated he was unwilling to act as a receiver but willing to act as a special master. While it may be that Johnson, Miller & Co. is willing to act as a receiver in this case, the Court concludes that the less drastic measure of appointment of a special master is warranted. The Court notes that, subject to the reports and recommendations of the special master, the United States may move the Court to reconsider the appointment of a receiver in this matter, and, further, upon the first report of Mr. Cowen as special master, the Court will consider whether appointment of Johnson, Miller & Co as a co-special master is appropriate and feasible.

[Doc. 103, pp. 15-16]

In appointing Mr. Cowen as Special Master, the Court ordered him to, *inter alia*: familiarize himself with Defendants' business operations; confirm that HPL is not charging a commission for the sale and purchase of cattle; and provide a monthly "compilation of the dealer activities" to the Court.  [Doc. 104, ¶¶ I.1, I.12]  The Court granted the Special Master broad authority to monitor the financial activities of HPL and granted him electronic access to HPL's bank accounts.  [Doc. 104, ¶¶ I.9, II.1, II.5]  In addition, the Court ordered the Special Master to "attend and review in person as many actual dealer transactions as the Special Master determines is reasonable."  [Doc. 104, ¶ 5]  Finally, the Court ordered Mr. Cowen to submit "an accounting of all bank accounts

and assets, debts and liabilities maintained by High Plains Livestock." Additional requirements, as pertinent, are set forth below.

Mr. Cowen has been submitting information to the Court for over one year now. Mr. Cowen submitted his accounting on February 12, 2016. [Doc. 138] This document identifies the total outstanding debts, liabilities and assets of HPL. According to Mr. Cowen, the "obligations" as of February 2016 were $1,057,120, the assets were $1,576,500, and the net equity was $519,380. At that time, the estimated monthly profits were estimated at $118,053 (this number was actually based on only three weeks' worth of data), and monthly obligations were $114,692. [Doc. 138] The most recent "Balance Sheet" addressing assets and liabilities shows that, as of January 31, 2017, assets are $1,479,325.75 and "liabilities" are $1,500,430.56.[9] [Doc. 288-1, pp. 1-3] Thus, these documents suggest that, after resuming operations for approximately a year, HPL's obligations increased by $443,310.56, its assets decreased by $97,174.25, and HPL's liabilities are now greater than its assets.

---

[9] The amount of liabilities comes from a single sheet titled "LIABILITIES AND EQUITY." [Doc. 288-1, p. 2] As the Special Master did, the Court added together the three categories, titled "Total Current Liabilities," "Total Long Term Liabilities," and "Total Equity." [Doc. 288-1, p. 2] It is unclear to this Court whether the "Total Equity" actually reflects a liability or an asset, and why. The Special Master does not explain this category, why it is included with liabilities, or his calculations.

Mr. Cowen created income statements[10] for the months ending February 28, 2016 to January 31, 2017, which the Court summarizes here.[11]  Where Mr. Cowen did not combine the income or loss from the Operating and Cow accounts, the Court has done so.

- February, 2016, combined net income of $72,406.00 [Doc. 240-1, pp. 1-2]
- March, 2016, combined net income of -$16,747.30 [Doc. 240-1, pp. 3-4]
- April, 2016, combined net income of $116,623.15 [Doc. 240-1, pp. 5-6]
- May, 2016, combined net income of -$31,465.79 [Doc. 240-1, pp. 7-8]
- June, 2016, combined net income of -$92,079.84 [Doc. 240-1, pp. 9-10]
- July, 2016, combined net income of $6,925.56 [Doc. 240-1, pp. 11-12]
- August, 2016, combined net income of $63,391.62 [Doc. 264-1, p. 2]
- September, 2016, combined net income of -$72,798.68 [Doc. 277-1, p. 2; Doc. 278-1, p. 2]
- October, 2016, not submitted by Special Master
- November, 2016, combined net income of $218,853.74 [Doc. 284-1, pp. 4-5]
- December, 2016, combined net income of -$23,593.19 [Doc. 285-1, pp. 4-5]
- 2016 combined year-end net income of $178,621.92 [Doc. 285-1, p. 5]
- January 31, 2017, combined net income of -$11,895.40 [Doc. 288-1, pp. 1-3]

On March 16, 2016, the United States filed its *Motion for Appointment of Receiver and/or Co-Special Master, or Preliminary Injunctive Relief.*  [Doc. 153]  In its *Motion*, the United States argued that the Special Master's oversight was insufficient.  The United States requested either the "appointment of Johnson Miller & Co. as receiver and/or co-Special Master to conduct a financial review of each Defendant and a viability analysis of HPL" or for the Court to grant its request for a preliminary injunction, i.e., to enjoin Defendants from continuing to operate.  [Doc. 153, p.1]  Broadly, the United States

---

[10] These income statements reflect: revenue and cost of sales, which are added together to equal gross profit, minus operating expenses, plus or minus transfers in or out, to equal the net income or loss.

[11] Mr. Cowen did not begin creating these income statements until August, 2016. However, at that time, he submitted income statements for every period from February through July, 2016 as well.  [Doc. 240]

argued that HPL was "not meeting its obligations due to unpaid bills and a negative reconciled balance in their operating account" [Doc. 153, p. 6] and that HPL was in violation of GIPSA requirements to file annual reports.  [Doc. 153, p. 6]  The Court sets out the United States' arguments in greater detail for purposes of considering its *Motion*.

The United States reported that it had sent a letter to the Special Master asking the Special Master to "clarify questions raised by his early reports."  [Doc. 153, p. 7; Doc. 137, pp. 2-3]  Based on the Special Master's response, the United States laid out (in its brief) several perceived failings by the Special Master.  First, the United States raised concerns about whether the Special Master identified the sellers he approved HPL to purchase from, and that the Special Master "did not list the steps the Special Master is taking to ensure HPL's dealer operations are indeed limited to those entities."  [Doc. 153, p. 7]  The United States argued that the Special Master reported that he had not attended any transactions [Doc. 153, p. 7], though the Court Order appointing the Special Master required the Special Master to "attend and review in person as many actual dealer transactions as the Special Master determines is reasonable."  [Doc. 104, p. 3, ¶ I.5]  The Special Master responded to this concern, stating:  "The dealer transactions occur almost 100% of the time via telephone with Calvin Pareo and the producer.  Many times the producer calls for pick-up without any transaction arrangements being made.  The Special Master has not attended any transactions in person to date."  [Doc. 134, p. 2]

The United States argued [Doc. 153, p. 8] that the Special Master failed to comply with this Court's Order [Doc. 104, pp. 3-4] requiring him to "verify the accuracy of Defendants['] representations to the Court" regarding aspects of HPL's operations,

including determining "where Defendants sell or ship the cattle;" the Special Master failed to acquire HPL's agreements with cattle buyers and review those agreements for reasonableness; the Special Master failed to determine which dairies Defendants purchased from and how many cows a week were purchased from those dairies; and the Special Master failed to report on the activities anticipated during ongoing operations. In addition, the United States argued that HPL was required to provide the Special Master with copies of checks and paperwork documenting purchases and sales of cattle. [Doc. 153, p. 9] The United States argued that the Special Master did not ensure that Defendants were not wasting or losing property. [Doc. 153, p. 9] The United States argued that the Special Master submitted insufficient evidence to determine whether HPL has brought its leases and subleases current. [Doc. 153, p. 10] From what was provided, the United States concluded "that HPL is not meeting its monthly obligations." [Doc. 153, pp. 10-11]

The United States raised concerns about an entry on the January 19, 2016 operating account stating that HPL paid for babysitting. [Doc. 153, p. 11] When the United States raised this concern to the Special Master, the Special Master submitted that the transaction was actually for contract labor to "help convert to dealer status." [Doc. 153, p. 11] The United States expressed suspicion regarding this entry given that Defendants represented that they were operating as a dealer for an entire year prior to this entry. [Doc. 153, p. 11]

The United States argued that certain operating account reconciliations submitted to the Court show a negative balance, "indicating that HPL is writing checks on this

account that cannot be paid with the available funds." [Doc. 153, pp. 11-12] HPL also had several instances of being assessed overdraft fees. [Doc. 153, p. 12] There was also a $100 variance between the reconciled bank and book balances of HPL as of February 1, 2016. [Doc. 153, p. 13]

The United States raised concerns about Mr. Cowen's summary of HPL's obligations. First, the United States complained that only the obligations as to Savant Holsteins were addressed. [Doc. 153, p. 13] Second, the United States submitted that the February payment for certain of these leases was over $700 less than what the "Summary of Obligations" showed to be due on those leases, and that other lease payments were not made. [Doc. 153, pp. 13-14] Next, the United States raised concerns about one deposit which is shown on HPL's February operating account statement from Wells Fargo which is not shown on the Special Master's "Deposit Profit Detail Report." [Doc. 153, p. 14] In addition, the United States pointed to what may be discrepancies or errors in the Special Master's reporting of the number of leases and how many leases are in arrears. [Doc. 153, p. 18] The United States also complained that the Special Master did not report whether insurance was being maintained on certain equipment as required by various leases. [Doc. 153, p. 21] The United States desired more information regarding the Fiske lease for 1,437.2 acres of land in order to determine whether HPL was purchasing the property or the terms of the lease were extended. [Doc. 153, p. 22] And the United States questioned whether HPL was making payments on particular finance agreements with Savant Holsteins. [Doc. 153, p. 24] The Special Master submitted unsigned mortgage documents for two mortgages, however, the financial documents did

not show that HPL is paying these mortgages, and thus the United States submitted that HPL was not meeting its obligations. [Doc. 153, pp. 22-23]

The United States also argued that there are "pass through" sales attributed to the seller "RV," which are not included in the calculation of the net income for HPL. [Doc. 153, p. 15] The United States argued that it appears that HPL is "[c]omingling HPL's revenue with that of [RV Cattle]." [Doc. 153, p. 16]

The United States argued that HPL failed to file its 2014 annual report, which was due to GIPSA on April 15, 2015. [Doc. 153, p. 16] The United States also raised a concern that the Special Master did not explain entries on HPL's operating account called "billing impound" and "tax impound." [Doc. 153, p. 17] Further, the United States disputed the Special Master's valuation of HPL's property. Where the Special Master indicated the livestock facility to be worth $500,000, the United States stated that Roosevelt County records indicate the facility to be worth over $700,000. [Doc. 153, p. 17]

The United States took issue with the Special Master's inventory as being insufficient, i.e., not including certain vehicles as inventory and not considering possible investments or member capital contributions. [Doc. 153, pp. 19-20] Finally, the United States questioned why the Special Master did not address the fact that HPL is referred to as a New Mexico corporation in some documents and a Texas corporation in other documents.[12] [Doc. 153, p. 25]

---

[12] The United States raised yet more issues which are not set forth herein.

13

HPL responded to the *Motion for Appointment of Receiver* and attempted, by a *Declaration of Darcie Pareo* and by exhibits, to address many of the concerns raised by the United States.  For example, Ms. Pareo stated that HPL provides Mr. Cowen with a detail of each dealer transaction within 24 hours of a sale.  [Doc. 164, ¶ 5]  The "transaction summary" provides a listing of each cow, its price per head, its weight as calculated by HPL and a shrink calculation if applicable.  [Doc. 164, ¶ 14]  Ms. Pareo stated that "many customers requested" the weight information "to help them compare the prices they receive from HPL to other outlets they use for their cattle."  [Doc. 164, ¶ 14]  Ms. Pareo stated she also provides a spreadsheet with "the check groupings" to Mr. Cowen twice a week, which includes "all the aspects of the transactions to comply with credit agreements."  [Doc. 164, ¶ 5]  She stated that Mr. Cowen has regular meetings with the Pareos and goes over transactions at that time and thus he is able to determine, from the information he is provided, whether the price paid for cattle is fair and reasonable. [Doc. 164, ¶ 10]

Mr. Cowen also has real-time online access to HPL's bank accounts [Doc. 164, ¶ 11], which includes the ability to review Wells Fargo's images of checks presented for payment.  [Doc. 164, ¶ 15]  According to Ms. Pareo, profits from the cattle dealer operation are transferred from time to time from the "cow account" to the "operating account," "on an as needed basis, depending on the expenses that need to be paid."  [Doc. 164, ¶¶ 17, 18]  Ms. Pareo stated that there are instances in which an expense is paid from the operating account before funds have been transferred from the cow account to the

operating account, particularly "when a check has been written for purchase of fuel, parts, feed, etc.; and the receipt has not been turned in yet." [Doc. 164, ¶ 18]

Ms. Pareo stated that HPL was required to contact the Special Master to get approval of all dairies with which it wanted to do business, and to be approved, HPL was required to submit its prior history with the potential customer, the potential customer's willingness to sign a credit agreement, and HPL's reason for doing business with the customer. [Doc. 164, ¶¶ 7-8]

Ms. Pareo stated that HPL does not have any written agreements with the entities to which HPL sells and ships cattle, as doing so is not a common practice. Rather, a settlement sheet is provided which states the prices received for cattle, and this information is provided to Mr. Cowen "within the 24 [hour] period." [Doc. 164, ¶ 12]

With regard to leases and mortgages, Ms. Pareo stated that there are five entities with which HPL has leases, and those entities are aware of HPL's legal situation and the nature of HPL's business. Thus, Ms. Pareo stated that these entities were "willing to work with HPL," and with her affidavit she submitted letters from four of these creditors demonstrating that they put the "finance agreements on temporary hold" [Doc. 164, p. 18] or they deferred payments, or they "agreed to forgo payments for a short time" and such payments had since resumed. [Doc. 164, pp. 19, 20, 28] Ms. Pareo stated that the payments on the fifth lease were current. [Doc. 164, ¶ 27]

With regard to the late 2014 GIPSA report, HPL provided documentation in the form of a letter from the Regional Director of the Grain Inspection, Packers and Stockyards Administration granting an extension of the report deadline to August 7,

2015. [Doc. 164, p. 27]  Defendants argue that HPL was unable to complete its report because its records were seized during the January 2015 search. [Doc. 164, p. 5] Defendants state that the 2014 report is the only outstanding report. [Doc. 164, p. 5]

Ms. Pareo explained that Wells Fargo performs HPL's payroll calculations, and Wells Fargo deducts the tax impoundment for payroll taxes and the billing impoundment for its services. [Doc. 164, ¶ 35]  Finally, Ms. Pareo explained that Mr. Cowen came up with the estimation of the value of HPL's property, and Ms. Pareo cited the sales amounts or asking prices of other sale barns in New Mexico for comparison. [Doc. 164, ¶ 36]

In its Reply Brief, the United States argued that it was problematic that Darcie Pareo was purporting to explain the operations of HPL to the Court, rather than the Special Master, because the duty of the Special Master is to "verify the accuracy of Defendants' representations." [Doc. 182, p. 1]  Though the United States admitted that it is not contrary to GIPSA regulations, the United States argued that it was inappropriate for Defendants to "commingle" funds from the cow account and the operating account because Ms. Pareo testified at the hearing before Magistrate Judge Lynch that "funds deposited into the cow account are only supposed to be those derived from HPL's permissible dealer activities" and the Court only authorized checks to be written from the cow account for the purchase of cattle and for deposits to be made from the sale of cattle. [Doc. 182, p. 4; *see* Doc. 104, p. 4]

The United States also addressed additional reports filed by the Special Master, questioning, a change in reporting method [Doc. 182, p. 2], "miscellaneous misstatements

and unexplained errors" [p. 3], and the Special Master's accounting methods [pp. 4-6], among several other new and repeated concerns [pp. 6-11].

On August 9, 2016, Mr. Cowen submitted a letter discussing the GIPSA requirements for maintaining a custodial account. The letter states that HPL is only operating as a "dealer" and therefore is not required to have a custodial account, and that the Court's Order "does not limit the use of the 'Cow Account' to livestock purchases only." Mr. Cowen concluded that HPL "has materially complied with the Court Order dated January 11, 2016 and with Packers & Stockyards Act in maintaining separate accounting through the use of the 'Cow Account' as stipulated." [Doc. 231-1, p. 1] The Court ordered the parties to respond to this letter. [Doc. 231] The United States responded by setting forth a list of complaints, not set out in full here, regarding the Special Master, for example, arguing that certain documents "demonstrate[] the Special Master's inability or refusal to comply with this Court's orders." [Doc. 243, p. 4] The Special Master responded to the United States' filing by submitting a letter addressing several of the United States' complaints, stating, *inter alia*, that no checks to dairies have been returned, and that payments to dairies were timely because the checks were dated within seven days of the bill of sale in compliance with HPL's credit agreements, and that HPL is purchasing cattle by the head, as evidenced by "the checks" being for "whole numbers." [Doc. 248-1, pp. 2-3]

The Court held a status conference on August 24, 2016, and informed the parties that the Court intended to set a trial date and combine the merits of the case with the hearing on the motion for preliminary injunction. [Doc. 272, p. 4] The parties indicated

that discovery was likely to continue through mid-2017.[13]  [Doc. 272, pp. 41-42]  The United States requested that the Court rely on the hearing before Magistrate Judge Lynch in order to rule on the *Motion for Preliminary Injunction*.  [Doc. 272, p. 42]  Defendants objected to this proposal on the grounds that the purpose of the hearing before Magistrate Judge Lynch was to consider the appointment of a receiver, and thus the parties did not treat it as a hearing for a preliminary injunction.  Defendants also argued that they did not have any discovery prior to the October, 2015 hearing.  [Doc. 272, pp. 42-44]  Later, Defendants stated: "I don't know why, frankly, why we need a preliminary injunction hearing for that, but I'm happy to schedule that and address that as the Court and counsel says."  [Doc. 272, p. 48]

The Court asked the parties to address particular filings by the Special Master as well as whether the Special Master was impartial.  [Doc. 272, p. 5]  The United States again complained about what it characterized to be insufficient information provided by Mr. Cowen, his reliance on Darcie Pareo for information, and whether he was acting as an advocate for the Defendants.  [Doc. 272, pp. 6, 11]  The United States complained that Mr. Cowen was not verifying, by contacting cattle sellers, either 1) the date they received payment for cattle to determine whether they were paid in the period to which the sellers and HPL had agreed or 2) whether the sellers were relying on Defendants to weigh the cattle in determining the price of the cattle. [Doc. 272, pp. 13-14]  Defendants conceded

---

[13] Prior to the hearing, the discovery deadline was January 16, 2017.  [Doc. 131] However, at the conference, the parties notified the Court that they would likely request the Court to extend the discovery deadline.  Ultimately the discovery deadline was continued to July 17, 2017.  [Doc. 255]  Pretrial motions are due July 31, 2017.  [Doc. 255]

that "perhaps [the Special Master] should call a couple of those people, if that's what [the United States is] suggesting, and say: When are you going to deposit that [check]?" [Doc. 272, p. 23]  Also at this hearing, Defendants stated that they no longer intended to wind down HPL.  [Doc. 272, p. 29]

The United States raised a concern that there is a $220,000 deposit into the cow account attributed to Savant Holsteins, which is a company which leases equipment to Defendants.  The United States argues that these funds could be a loan, demonstrating that HPL "is not able to remain afloat in their cow account based on buying and selling of cows."  [Doc. 272, p. 39]  In addition, the United States complained that there were a total of 77 checks that had not cleared and HPL had incurred a total of "$2,520 in fees for those checks not clearing."  [Doc. 272, p. 15]  While the United States at one point indicated that the 77 checks which had not cleared were checks which bounced [Doc. 272, p. 20], it later referred to Document 235-1, p. 9, which is a list of outstanding checks, i.e., checks which had not been presented for payment yet.[14]  [Doc. 272, p. 22; Doc. 235-1, p. 9]  Defendants argued that those checks were delivered to the sellers and the sellers had not yet deposited the checks as of the date that Mr. Cowen conducted his reconciliation of the account.  [Doc. 272, p. 23]

---

[14] The Court reviewed the operating account statements submitted for February through July, 2016 and found that 69 overdraft fees were charged.  [Docs. 161; 172; 215; 216; 217; 236-2]  After the hearing, the overdraft fees continued.  For example, in August, 2016, there were 17 checks presented for payment from the operating account when there were insufficient funds, resulting in 14 checks being paid, 3 checks being returned for insufficient funds, and 17 fees of $35.00 each for the overdrafts.  [Doc. 263-1, pp. 2-7]  In the operating account for January, 2017, there was one overdrawn check and associated $35.00 fee.  [Doc. 289-1, pp. 10-12]

The United States stated that its primary concerns are:  "Is High Plains Livestock solvent[?] . . . And are they complying with the law?"  [Doc. 272, p. 38]  Thus, "the United States again requests the Court that there be an accounting, an official accounting of what they have. Are they solvent?" [Doc. 272, p. 40]

The Court asked the government whether it had evidence of violations of GIPSA regulations since Mr. Cowen began acting as Special Master, to which the Government answered that it did not, because Mr. Cowen does not provide enough information to make such a determination.  [Doc. 272, p. 45]  The Court also asked the United States whether it had continued oversight responsibility even given the ongoing litigation.  The United States responded that once there is litigation, the Agency is very hesitant to go on the property to conduct its regular oversight "out of fear of . . . being accused of gathering evidence for the litigation."  [Doc. 272, p. 46]  Defendants stated that they had no objection to the Court recognizing the continuing authority of the agency to exercise its oversight responsibility.  [Doc. 272, p. 46]  Upon agreement of the parties, the Court orally ordered that GIPSA has "the continuing authority of the Agency to exercise that oversight responsibility." [Doc. 272, pp. 46-47]

Finally, Defendants advised the Court that all state charges against the Pareos were dismissed [Doc. 272, p. 29] and, for purposes of this opinion, the Court takes judicial notice that the charges against both Darcie and Calvin Pareo were dismissed by the district court and the cases have been appealed to the New Mexico Court of Appeals. Fed. R. Evid. 201(b) (allowing the court to take judicial notice of facts which "can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned"); *State of New Mexico v. Calvin Pareo*, D-911-CR-201500118 (accessed March 21, 2017), available at https://caselookup.nmcourts.gov/caselookup); *State of New Mexico v. Darcie Pareo*, D-911-CR-201500117 (accessed March 21, 2017), available at https://caselookup.nmcourts.gov/

caselookup.

Both before and after the United States filed its *Motion for Appointment of Receiver*, Mr. Cowen submitted various additional documents,[15] many of which address the concerns that the United States has raised thus far.  Mr. Cowen submitted his response to the United States' letter requesting more information, which, *inter alia*, stated that he was granted internet access to the cow and operating accounts, identified leases and amounts due, and stated that HPL had "verbal commitments from the individuals holding liens on the equipment, cows and facility that agreements can and will be modified to enhance the ability to be current with payments."  [Doc. 138]  He submitted a letter dated August 23, 2016, stating, "Attached is an offer from Wells Fargo to implement a Line of Credit for High Plains Livestock.  Note:  The bank[']s comment regarding a phenomenal relationship and insufficient funds not being an issue."  Attached is an email chain between a "Business Banking Relationship Specialist" with Wells Fargo and Darcie Pareo asking whether High Plains wished to discuss overdraft protection.  [Doc. 249-1, pp. 1-3] On October 7, 2016, he submitted a copy of an email from First United Bank, apparently to Calvin Pareo, with a hand-written note (the author of the note

---

[15]  The Court has filed all of the documents submitted by Mr. Cowen.  The Court describes several of the documents, but not all of them, here.

is not identified) stating "Custodial Acct used when operating as commission sales. Funds need to be utilized by transfer to operating Acct" without any other explanation. [Doc. 264-1, p. 3]  He also submitted a spreadsheet titled "Producers Livestock A/R Aging Detail As of August 31, 2016" with the handwritten note "Not Considered on P&L Compilation," and, again, no other explanation.  [Doc. 264-1, p. 4]  On occasion, Mr. Cowen submitted a spreadsheet labeled "Savant Loan standing."  [*See* Doc. 264-1, pp. 5-6; Doc. 277-4, pp. 1-2]  Given the lack of explanation of these spreadsheets, the Court is not able to make any useful conclusions from them.

## ANALYSIS

### *Legal Standards*

<u>Standards for Preliminary Injunction and Statutory Injunction</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Id.* at 24. The United States bears the burden to establish that it is entitled to a preliminary injunction.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006) (discussing the well-established principle that "the party seeking pretrial relief bears the burden of demonstrating a likelihood of success on the merits"); *see also Ocala Live Stock Mkt.*, 861 F.Supp. 2d at 1336 (finding that the United States met its burden of demonstrating it was entitled to relief under Section 228a).

Where an act provides for injunctive relief to prevent or prohibit violations of that act, "irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004) (internal quotation marks and citation omitted). At least one district court has held that "[b]ecause § 228a specifically authorizes injunctive relief, i.e., a 'statutory injunction,' the Court need not engage in the traditional four factor analysis applied to requests for injunctions." *United States v. Ocala Live Stock Mkt., Inc.*, 861 F.Supp. 2d 1328, 1335 (M.D. Fla. 2012). While acknowledging that our "Tenth Circuit has not repudiated" this statement in *Star Fuel*, the District of Colorado suggested that this statement may no longer be good law and that "no element of the injunction test should be presumed," citing *Winter*, 555 U.S. 7 and *eBay v. MercExchange*, 547 U.S. 388 (2006). Accordingly, the Court will consider the potential for irreparable harm. Further, for purposes of this case, the Court considers the elements of a preliminary injunction, and in doing so, considers whether the United States has demonstrated that it will be successful given the test set forth in Section 228a.

The PSA sets forth the elements which must be shown to obtain a temporary injunction "until a complaint under this chapter is issued and dismissed by the Secretary or until an order to cease and desist made thereon by the Secretary has become final and effective." 7 U.S.C. § 228a. The United States must demonstrate that a dealer or market agency,

> (a) with respect to any transactions subject to this chapter[,] . . . has failed to remit to the person entitled thereto the net proceeds from the sale of any such commodity sold on a commission basis; *or* (b) has operated while insolvent, or otherwise in violation of this chapter in a manner which may reasonably be expected to cause irreparable damage to another person; *or*

23

(c) does not have the required bond; *and* that it would be in the public interest to enjoin such person from operating subject to this chapter *or* enjoin him from operating subject to this chapter except under such conditions as would protect vendors or consignors of such commodities or other affected persons[.]

*Id.* (Emphasis added). Section 228a further states: "When needed to effectuate the purposes of this section, the court shall, upon a proper showing, issue a temporary injunction or restraining order, without bond." The statute does not define a "proper showing."

As the statute allows courts to either enjoin a packer from operating entirely or to allow operation only "under such conditions as would protect vendors or consignors of such commodities," courts applying Section 228a have considerable power to craft injunctive relief, which includes relief short of enjoining a dealer or market agency from operating. *Id.* For example, in *United States v. Eastern Kansas Livestock, Inc.*, 1989 WL 19411 (D. Kan. 1989), the court addressed a situation in which a market agency's liabilities outweighed its assets by over $925,000. *Id.* at *1. The court allowed the defendant to continue to operate on certain conditions, including "maintain[ing] its custodial account in conformance with the Act and all applicable regulations" and providing a monthly accounting to the United States with a copy submitted to the Court. *Id.* at *2.

Standards for Appointing a Special Master and a Receiver

Appointment of a special master is within the discretion of the district court. *Sims Consol., Ltd. v. Irrigation and Power Equip., Inc.*, 518 F.2d 413, 417 (10th Cir. 1975). The "court may appoint a master only to . . . address pretrial and posttrial matters that

24

cannot be effectively and timely addressed by an available district judge or magistrate

judge of the district." Fed. R. Civ. P. 53(a)(1)(C).

> As explained by Magistrate Judge Lynch:

> Factors typically considered when appointing a receiver are whether the party seeking the appointment has a valid claim, the probability that fraudulent conduct has occurred or will occur, imminent danger that property will be concealed or otherwise diminished, inadequacy of legal remedies, lack of a less drastic remedy, and the likelihood that appointing the receiver will be more beneficial than harmful. *See, e.g., Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*., 999 F.2d 314, 316-17 (8th Cir. 1993).

[Doc. 55, p. 30]

### *Discussion*

<u>The Court will Rule on the Request for a Preliminary Injunction without an Additional Hearing</u>

In this case, the factors considered by the Court in deciding whether a receiver is

appropriate are remarkably similar to those considered in the preliminary injunction

analysis. In addition, in his *Order Appointing a Receiver*, Magistrate Judge Lynch

separately conducted the analysis to determine whether preliminary injunctive relief is

appropriate, and found that "the United States has shown that it is entitled to preliminary

relief." [Doc. 55, pp. 26-29] Though Defendants object to the Court relying solely on

the evidence presented to Magistrate Judge Lynch, Defendants have not identified what,

if any, additional evidence they would be able to produce based on discovery, nor have

Defendants identified how that evidence would counter the overwhelming evidence of

the statutory violations and fraudulent dealings presented by the United States. Thus, the

Court concludes that it is appropriate for the Court to decide the *Motion for Preliminary*

*Injunction* [Doc. 7] based on the evidence already before the Court. The Court notes it considers this preliminary injunction pursuant to Federal Rule of Civil Procedure 65, and that this matter is a preliminary determination on the question of whether the United States is entitled to a statutory injunction under Section 228a.

Likelihood of Success on the Merits

In order to demonstrate that it is likely to be successful on the merits the United States must demonstrate that it is likely to be successful on its request for a statutory temporary injunction while the proceedings are pending before the Secretary of Agriculture. In order to establish its right to a statutory injunction, the United States must submit evidence establishing that Defendants either 1) failed to remit to cattle sellers the net proceeds of any sale sold on a commission basis, or 2) "has operated while insolvent, or otherwise in violation of this chapter in a manner which may reasonably be expected to cause irreparable damage to another person," or 3) that Defendants operated without the required bond. In addition, the United States must submit evidence that it is in the public interest to enjoin Defendants from operating entirely, or "from operating subject to this chapter except under such conditions as would protect vendors or consignors of such commodities or other affected persons." *Id.*

In the evidentiary hearing before Magistrate Judge Lynch, the United States handily demonstrated that, while Defendants acted as a market agency, Defendants failed to remit to cattle sellers the net proceeds of numerous cattle sold on a commission basis, Defendants repeatedly operated while insolvent, and that Defendants "operated in violation of the PSA in a manner which may reasonably be expected to cause irreparable

damage to others, which qualifies under § 228a(b)."  [Doc. 55, pp. 26-28]  Defendants

did not object to the Magistrate Judge's factual findings as clearly erroneous, and the

Court adopts those findings here.  Pertinent findings include, but are not limited to, that

HPL:

- routinely failed to remit the net proceeds from the auction to the sellers (*see, e.g.*, Test. Luce, Tr. Oct. 19, 2015, at 127-29 (cattle purchased at auction by Mr. Pareo that died before slaughter were not paid for); Test. Fish, Tr. Oct. 19, 2015, at 39-40 (cattle with back tag number 626 sold for $75.00 per hundredweight, but was marked down to $45.00 per hundredweight); Ex. 33 (invoice number 240642); Exs. 49-51 (rail price for cattle HPL purchased at auction "as a dealer" not disclosed and remitted to sellers)), which qualifies under § 228a(a); [and]

- operated while insolvent, as defined by § 204 (*see* Test. R. Prather, Oct. 22, 2015, at 30-32 (HPL's custodial account was short in 2009); *id.* at 38-43 (HPL's custodial account had a combined $1 million shortage in 2013); *id.* at 44 (HPL's custodial account had another shortage in December 2013); *id.* at 101 (Agent Prather found significant shortages in HPL's custodial account in October 2014 and February 2015)), which qualifies under § 228a(b); and

- operated in violation of the PSA in a manner which may reasonably be expected to cause irreparable damage to others, which qualifies under § 228a(b), by: . . . altering sale documents for the purpose of avoiding payment of the full amount due for livestock purchased for and on behalf of HPL (see, e.g., Test. Luce, Tr. Oct. 19, 2015, at 127-129 (testifying that HPL staff would shred scale tickets when cattle purchased by Mr. Pareo died before they could be slaughtered)), a violation of §§ 221 and 228b(a)[.]

[Doc. 55, pp. 27-28]  Thus, the United States demonstrated that Defendants committed

the predicate statutory violations.

The remaining question is whether the evidence supports the Court enjoining

Defendants from operating entirely or from operating "except under such conditions as

would protect vendors or consignors of such commodities or other affected persons."

Section 228a.  The Court notes that, given the statutory silence regarding when one or the

other of these options applies, the Court has discretion to determine which relief is more

27

appropriate. Thus, it does not necessarily follow from a showing of a statutory violation that the party seeking the injunction has demonstrated the need for a complete injunction on operation. The Court returns to considering this issue below, when balancing the equities at issue in this case.

Irreparable Harm

The United States demonstrated both that Defendants failed to remit the net proceeds of several sales of cattle to the sellers and that HPL operated while insolvent. These facts show violations of the PSA. The Court finds it significant that the United States has no evidence of statutory violations, and most particularly fraudulent conduct toward cattle sellers, since the Special Master has been instated. Nonetheless, even if HPL continues to operate solely as a dealer, even since the institution of the Special Master there is evidence demonstrating a serious risk of insolvency. Given the high volume of sellers to whom HPL owes proceeds at any given time, coupled with Defendants' significant other debts and liabilities, HPL's collapse would cause significant harm to the dairy industry in New Mexico and HPL's creditors. Thus, the United States has met its burden to demonstrate the likelihood of irreparable harm.

The Balance of Equities

In balancing the equities, courts:

> must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

*Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted).  Thus, the Court must evaluate and compare "the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied."  11A Wright, Charles Alan et al. Fed. Prac. & Proc. Civ. § 2948.2 (3d ed. 2013).

First, the United States requests that this Court enjoin Defendants from operating at all.  Clearly, immediately entirely shuttering Defendants' business is a harsh remedy which will cause an extreme hardship to Defendants.  Further, the Court is not convinced that such immediate action will indeed protect the interests the United States seeks to vindicate.  "The purpose of the Act is to protect producers and consumers[.]"  *Solomon Valley Feedlot, Inc. v. Butz*, 557 F.2d 717, 720 (10th Cir. 1977).  Simply immediately enjoining Defendants from operating as a cattle dealership will likely result in Defendants defaulting on numerous loans as well as potentially failing to pay several cattle sellers with whom Defendants have credit agreements.  Further, slowly winding down the business may be likely to preserve more assets.  Thus, the Court concludes, based on the evidence currently before the Court, that enjoining Defendants from operating under such conditions is not in any party's interest.

Fortunately, Section 228a grants the Court the discretion to consider various conditions in granting relief.  Thus, the Court next considers the United States' previous proposal of appointing a receiver for the purpose of winding down Defendants' business.  [Doc. 61, p. 2]  Such "winding down" can be done in one of two ways:  1) by immediately closing the business and selling off assets to cover liabilities, or 2) by

allowing the receiver to operate the business until the business can be sold in order to ensure it produces income until that time. Either of these options will cause Defendants to suffer serious financial loss. Considering the benefit to the United States and the interests the United States seeks to vindicate, the second option is clearly the better choice. However, based on the evidence currently before the Court, this option does not appear viable. As stated by the Court in January of 2016, "the difficulty which has become clear since December 8, 2015, is that there may not be any individual willing and qualified to act as a receiver in this case." [Doc. 103, pp. 15-16] The Court reached this conclusion based on the following information: 1) the United States' letter to the Court dated November 12, 2015, in which it identified several possible receivers, yet stated that it had "not been able to find a single individual with both the interest and the capability of running High Plains Livestock successfully," and, though it identified Johnson Miller & Co., the United States recognized that the accounting company "expressed concern about pricing cattle and otherwise running the cattle side of the business" [Doc. 51]; 2) both of the potential receivers/special masters recommended by Defendants declined appointment as a receiver; 3) no party has addressed whether a proposed receiver has (or needs) the appropriate licenses to operate as a dealer or market agency; and 4) Defendants' evidence that HPLs lienholders would consider HPL in default if operated by a receiver. Thus, on the information before the Court, the United States has not met its burden of establishing that this option is possible.

Accordingly, the Court weighs the next option identified by the United States: appointing Johnson Miller & Co. as a co-special master for purposes of conducting an

30

accounting or viability analysis of HPL. [Doc. 153, p. 1] Weighing the equities of this option, the Court concludes that it presents minimal hardship to Defendants, with the hardship being the expense and time associated with the analysis. As to the United States, this option will provide the benefit of the additional information which the United States argues is lacking but necessary to determine whether HPL is viable as an ongoing operation. In addition, this option furthers the purpose of the PSA by allowing the Court to ensure that Defendants are not operating while insolvent.

Finally, the Court considers the equities of maintaining the status quo. Since January 11, 2016, this Court has required Defendants to operate under constraints, i.e., HPL was forbidden from operating as a market agency and only allowed to operate its cattle dealership and other operations under the oversight of a Special Master, who provided regular compilations to the Court. [Doc. 103, pp. 15-16; Doc. 104] The Special Master's obligations, in turn, were to: familiarize himself with the business; monitor HPL's financial transactions; provide monthly "compilations" of the dealer and other activities of HPL; report to the Court any irregularities "apparent in any of the Defendants' accounts, property, and activities"; and "perform an accounting of all bank accounts and assets, debts and liabilities maintained by High Plains Livestock." [Doc. 104] Defendants proposed this course of events in lieu of a receiver, and thus the Court concludes that the hardship on Defendants, including the costs, is neither significantly burdensome nor unreasonable when weighed against the potential hardships to the United States. The United States, however, in essence argues that the status quo poses a hardship on it because the monitoring conditions are insufficient and "Defendants'

continued operation is placing the livestock industry at significant risk of serious harm."

[Doc. 153, p. 26]

The United States reported to this Court that it has no evidence that the Defendants have operated in violation of the PSA or GIPSA regulations since the Special Master was appointed. [Doc. 272, p. 45] Specifically, at the August, 2016 status conference, the following exchange took place between the Court and the United States:

> THE COURT: . . . In light of the concerns that the government has raised here, do you believe that you have clear evidence here that there would be violations of GIPSA even currently with Mr. Cowen undertaking his responsibilities as a special master?
> MS. KEEGAN: No, Your Honor. And that's the problem, is Mr. [Cowen] raises these issues but does not give the Court or the United States sufficient information to make a determination.

[Doc. 272, p. 45] The Court will address sufficiency of the information from Mr. Cowen in two parts: 1) information regarding compliance with the PSA generally, and 2) information regarding HPL's solvency.

As to the information provided by Mr. Cowen regarding Defendants' compliance with the PSA, the Court concludes that Mr. Cowen has complied with the Court's *Order* and the information before the Court does not demonstrate a need for additional evidence from Mr. Cowen on Defendants' compliance. In reaching this determination, the Court notes that it did not appoint a special master for the purposes of circumventing the discovery process or GIPSA's regulatory authority. The Court ordered Mr. Cowen to confirm that HPL was not charging a commission and was purchasing cows by the head. [Doc. 104, I.1.g, h] Mr. Cowen has reported on this matter [Doc. 248-1, pp. 2-3], and to the extent the United States disagrees, it has the tool of discovery. The Court ordered that

Mr. Cowen had the authority to determine with which cattle sellers Defendants could do business.  [Doc. 104, ¶ I.4]  The Court ordered Mr. Cowen to "attend and review in person as many actual dealer transactions as the Special Master determines is reasonable." [Doc. 104, ¶ I.5]  The Court ordered Mr. Cowen to determine the accuracy of several of Defendants' representations, determine where Defendants ship cattle, and obtain and review the agreements between the Defendants and the buyers.  [Doc. 104, ¶ I.6]  The Court ordered Mr. Cowen to "confirm that appropriate arrangements have been made to pay the monthly obligations of High Plains Livestock and that such arrangements and obligation are being met."  [Doc. 104, ¶ II.6]  Finally, the Court ordered Mr. Cowen to conduct an accounting and to report to the Court any irregularities "apparent in any of the Defendants' accounts, property."  [Doc. 104, ¶ IV.1, 2]  As set forth above, Mr. Cowen has complied with these conditions, has provided information to this Court, and has explained why he does not attend transactions.  [Doc. 134, p. 2]  The information presented to the Court does not demonstrate any violations of the PSA or GIPSA regulations which would require this Court to enjoin HPL from operating as a dealer or to adopt new conditions.[16]

---

[16]  The United States fails to demonstrate a connection between many of its complaints and Defendants' compliance with the PSA or GIPSA regulations.  For example, the United States fails to draw a connection between the number of dairy sellers approved by the Special Master or his method of approval and HPL's compliance with the PSA. Further, the United States acknowledges that it is not contrary to GIPSA regulations for HPL, acting as a dealer, to transfer funds from the cow account to the operating account. In addition, questions related to Mr. Cowen's accounting methods may require the parties to rely on expert testimony.  Because the United States has requested the Court to decide its *Motion for Preliminary Injunction* without taking further evidence, the Court does not

That said, Defendants have agreed that Mr. Cowen can call dealers to inquire into when the dealers received proceeds from the sale of their cattle to HPL.  [Doc. 272, p. 23] The Court will order that Mr. Cowen make such inquiries.

The Court now considers whether Mr. Cowen's reports are sufficient for the Court to determine whether HPL is solvent as required by the PSA.  The Court agrees with the United States that Mr. Cowen's submissions leave many questions and are not presented in a manner which allows a quick or easy determination of whether Defendants are operating while insolvent.[17]  While the Court has done its best to pull facts from the submissions, the Court can reach very few useful conclusions based on what has been submitted.

Nonetheless, based on the information provided by Mr. Cowen, the Court can conclude that there is a serious question regarding whether HPL is "operat[ing] while insolvent, or otherwise in violation of this chapter in a manner which may reasonably be expected to cause irreparable damage to another person."  7 U.S.C. § 228a(b).  This question arises from the following information before the Court:  1) the Special Master's reports, which show a combined net income deficit in five out of twelve months (February 2016 to January 2017) [Docs. 240-1; 264-1, p. 2; 277-1, p. 2; 278-1, p. 2; 284-1, pp. 4-5; 285-1, pp. 4-5; 288-1, pp. 1-3]; the Special Master's current valuation of

---

have the benefit of such testimony.  Therefore, the Court presumes for purposes of this Order that there are no irregularities or deficiencies in Mr. Cowen's accounting methods.

[17] The Court acknowledges that Mr. Cowen noted, in one of his submissions:  "I requested from the beginning if additional information was needed in regard to the information being provided to the Court.  I got no response."  [Doc. 248-1, p. 3]  Without argument by the parties, the Court declined to alter the conditions set forth in the *Order Appointing Gayland Cowen as Special Master*.

HPL's liabilities and assets, which demonstrates that HPL's liabilities are greater than its assets by $21,104.81, showing a significant change from last year's estimate that HPL had net equity of $519,380 [Doc. 138]; unexplained deposits from Savant Holsteins in the amounts of $192,500 in March, 2016 and $220,000 in July, 2016 into the cow account[18] [Doc. 172-4, p. 1; Doc. 240-1, p. 11]; and numerous checks presented to the operating account which resulted in overdraft fees.

Thus, in exercising its discretion, the Court concludes that the status quo is insufficient to protect the cattle sellers doing business with Defendants, Defendants' creditors, and the livestock market as a whole.  After balancing the equities, the Court concludes that the most appropriate conditions are: 1) to maintain Mr. Cowen as a Special Master; 2) in addition to Mr. Cowen's duties as set forth in the Court's Order dated January 11, 2016, require Mr. Cowen to randomly inquire, each month, with 20% of the sellers with whom Defendants did business that month to determine that the sellers are receiving their proceeds within the deadlines required by the PSA and GIPSA regulations, or their credit agreement (if any); 3) appoint a Co-Special Master for the purposes of a) conducting a viability/solvency analysis of HPL, and, if HPL is not solvent b) proposing a plan to wind down HPL which will best protect the interests of Defendants' creditors, the cattle sellers, and the livestock market generally.

---

[18] These figures are from Mr. Cowen's reports.  The March Wells Fargo Cow Account statement only specifically identifies one deposit for $96,250 as coming from Savant Holsteins [Doc. 172-4, p. 1], and the July Wells Fargo Cow Account statement only reflects two deposits from Savant Holsteins for $90,000 each.  [Doc. 240-1, p. 3]  Most deposits are identified as "eDeposit IN Branch/Store," thus making it impossible to determine the source(s) of each deposit.

Injunction is in the Public Interest

Finally, the United States must prove that "it would be in the public interest to enjoin such person from operating subject to this chapter or enjoin him from operating subject to this chapter except under such conditions as would protect vendors or consignors of such commodities or other affected persons[.]" 7 U.S.C. § 228a. Because the United States must advance the interest of the public, the Court considered this factor in weighing the equities and interests of the parties. The best interest of the public is to protect the integrity of the market, Defendants' creditors, and the cattle sellers with whom Defendants operate. Accordingly, the United States has established this element.

In summary, the Court concludes that the United States has demonstrated that it is entitled to preliminary injunctive relief, as set forth above.

Motion for Co-Special Master or Receiver

The Court considered *United States' Motion for Appointment of Receiver and/or Co-Special Master or Preliminary Injunctive Relief* [Doc. 153] in considering the United States' *Motion for a Preliminary Injunction to Enjoin Defendants from Violating the Packers and Stockyards Act and Memorandum in Support* [Doc. 7]. For the reasons set forth above, the Court will grant this motion as the United States has demonstrated the need for a Co-Special Master.

**CONCLUSION**

**WHEREFORE**, for the reasons set forth above, the Court **HEREBY:**

36

1) **GRANTS** the United States *Motion for a Preliminary Injunction to Enjoin Defendants from Violating the Packers and Stockyards Act and Memorandum in Support* [Doc. 7]; and

2) **GRANTS** the *United States' Motion for Appointment of Receiver and/or Co-Special Master or Preliminary Injunctive Relief* [Doc. 153].

**FURTHERMORE**, for the reasons set forth above, the Court **HEREBY ORDERS** that the parties shall submit the following to the Court within fourteen (14) days of entry of this ORDER**:**

1) A list of potential Co-Special Masters along with their letters of interest; and

2) A joint report as to the status of the proceedings before the Agency.

3) Any position based on this Court's action on the Special Master's Reports, pursuant to Federal Rule of Civil Procedure 53(f).

**FURTHERMORE**, upon receipt of the above submissions, the Court will craft an order setting forth the injunctive relief granted.

**SO ORDERED** this 31st day of March, 2017 in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge